UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X   Civil Action No.:
CONOCOPHILLIPS COMPANY,

                                    Plaintiff,        COMPLAINT

        -against-



MARGARET ANN RUGGIERO & RODNEY C.
BOCCADORO, JR.,

                                    Defendants.
-------------------------------------------------------------X

        CONOCOPHILLIPS COMPANY, by and through its attorneys Salon Marrow

Dyckman Newman & Broudy LLP complaining of the defendants, alleges and says:


## PARTIES

        1.    At all relevant times Plaintiff CONOCOPHILLIPS COMPANY,

("Plaintiff") was and is a corporation organized and operating pursuant to the laws of the

State of Delaware with its principal place of business located at 600 North Dairy

Ashford, Houston, TX 77079.

        2.    Upon information and belief, defendant MARGARET ANN RUGGIERO

("RUGGIERO") is a natural person, with her principal place of residence located at 318

Grand Street, Newburgh, NY 12550.

        3.    Upon information and belief, defendant RODNEY C. BOCCADORO,

JR., ("BOCCADORO") is a natural person, with his principal place of residence located

at 318 Grand Street, Newburgh, NY 12550.


134291

4.    This is not a consumer credit transaction.

## JURISDICTION AND VENUE

5.    Federal Subject matter jurisdiction exists pursuant to 28 U.S.C. §1332 in that all named parties to this action are of completely diverse citizenship and the amount in controversy exceeds the sum of $75,000.00.  CONOCOPHILLIPS COMPANY is a citizen of the State of Delaware as a Delaware corporation. RUGGIERO and BOCCADORO are citizens of the State of New York in that RUGGIERO and BOCCADORO reside in the State of New York.

6.    Venue is properly placed in the Southern District of New York under 28 U.S.C. 1391(a)(2) because the Defendants residences are located in Orange County which is located in this judicial district and a substantial part of the events giving rise to the claim occurred in this judicial district.

## AS AND FOR A FIRST CLAIM

7.    On or about and between August 1, 2001, and October 31, 2001, Plaintiff predecessor Phillips Petroleum Company ("Phillips") and C.A.S HANDLING, INC., a non-party to this litigation (hereafter "CAS"), entered into a series of written agreement(s), whereby Phillips agreed to deliver and provide certain goods and lease certain equipment to CAS, and CAS agreed to accept such goods and equipment leased, to comply with Phillip's Policies and Procedures for the equipment leased, and pay for the goods and for the equipment leased to CAS.

134291

8.    Phillips Petroleum Company and Conoco Inc., merged on or about August 30, 2002, whereby Plaintiff became the successor corporation.

9.    Plaintiff, as the successor corporation by merger, has assumed the contractual rights and obligations associated with CAS and the Defendants.

10.    Phillips and Plaintiff provided the aforementioned goods and leased certain equipment to CAS and otherwise performed its obligations under the written agreement(s).  Annexed hereto as Plaintiff's Exhibit "A" is true copy of the written agreement(s).

11.    CAS thereafter failed to make payments for the goods actually delivered and failed to make payments under the lease for the equipment leased to the Defendants.

12.    At the express or implied request of CAS, Philips and Plaintiff sold and delivered certain goods to CAS in which the fair and reasonable value of the goods sold and delivered to CAS is $516,993.79.

13.    As a result of CAS's failure to pay the reasonable value and agreed price of the goods sold and delivered, CAS has been unjustly enriched in the amount of $516,993.79.

14.    By reason of the foregoing, Plaintiff is alternatively entitled to recover damages in quantum meruit against CAS in the sum of $516,993.79.

15.    There remains an unpaid balance of $516,993.76, due and owing to the Plaintiff from the CAS, pursuant to the agreement(s) notwithstanding Plaintiff's demand for payment.

16.    In order to induce Phillips, Plaintiff's predecessor to extend credit, conduct business, deliver and sell goods, and lease equipment to CAS, defendants

134291

RUGGIERO and BOCCADORO on or about July 25, 2001, executed a guaranty agreeing to unconditionally personally guarantee the prompt payment of all present and future indebtedness owed by CAS to Plaintiff. (Annexed hereto as Exhibit "B" is a true copy of the personal guaranty acknowledgment executed by RUGGIERO and BOCCADORO)

17.    The aforementioned guaranty to unconditionally personally guarantee the prompt payment of all present and future indebtedness owed by CAS to Plaintiff allows Plaintiff to seek recovery directly from RUGGIERO and BOCCADORO.

18.    The aforementioned guaranty allowed Phillips without notice to defendants to sell, assign, or transfer the guaranty to the Plaintiff.

19.    Plaintiff as the holder and owner of the guaranty is entitled to enforce the obligations contained within the guaranty against the defendants.

20.    RUGGIERO and BOCCADORO have failed and refused to make payment to Plaintiff of the sum of $516,993.79 notwithstanding demand therefore.

21.    By reason of the foregoing, Plaintiff is entitled to recover damages from the defendants RUGGIERO and BOCCADORO in the sum of $516,993.79 together with costs, and interest.

**WHEREFORE,** CONOCOPHILLIPS COMPANY, respectfully requests that this Court grant the Plaintiff, a Judgment on its First Claim against the defendants and each of them jointly and severally in the sum of $516,993.79, together with interest, the costs of this action, and such other and further relief that is just, necessary, and proper.

134291

Dated:  New York, New York
        July 16, 2008

                                Yours, etc.

                                Salon Marrow Dyckman Newman & Broudy LLP

                        By: _____
                                William J. Cortellessa (WC-9955)
                                Attorneys for Plaintiff
                                CONOCOPHILLIPS COMPANY
                                292 Madison Avenue, 6th Floor
                                New York, New York 10017
                                (212) 661-7100

To:     MARGARET ANN RUGGIERO
        318 Grand Street
        Newburgh, NY 12550

        RODNEY C. BOCCADORO, JR.
        318 Grand Street
        Newburgh, NY 12550

134291

*Exhibit A*

NOV-30-2004  15:21
12/15/2003  16:52    845567  39    CAS HANDLING INC  *Lewze*    PAGE 82/05    P.19/24
918-74  .971 *Plan*    P.2 *Auto*
*jtaylor*    *Co Ins*
*(CN. 8-7.01*
*to:*

## AVIATION REFUELER LEASE AGREEMENT

THIS AGREEMENT, made and entered into this date of
_August 1, 2001_, by and between PHILLIPS 66 COMPANY, a division of
Phillips Petroleum Company, a Delaware corporation, having its
principal office in Bartlesville, Oklahoma, hereinafter referred to as
"Lessor", and

_C.A.S. HANDLING, INC.; Stewart Intl Airport; 1037 First St, Bldg 140;_
_New Windsor, NY 12553 (40063378/110524)_, hereinafter referred to as
"Lessee".

Lessor agrees to deliver and lease to Lessee for Lessee's use on
the _Stewart Intl Airport (SWF); New Windsor, NY_, the aviation
refueling truck or trucks (hereinafter referred to as "refueling
equipment") described as indicated by Addendum to this agreement.

This confirms our mutual understanding that the refueling
equipment described on the attached Addendum is, as of the above date,
leased to Lessee subject to the following terms and conditions:

1.  For the use of said refueling equipment during the term hereof,
    Lessee hereby agrees to pay Lessor the rental set out in the
    Addendum, plus applicable sales and use tax; said rental to be
    paid to Lessor in advance on the first day of each month, and to
    commence as of _See Addendum_. Lessor shall be permitted to
    increase said rental while this agreement is in effect by giving
    Lessee at least 60 days' advance written notice of the effective
    date of said increased rental. In the event of an increase in the
    rental, Lessee shall have the right to terminate this agreement on
    the effective date of said increase by giving Lessor at least 30
    days' advance written notice of its intention to terminate on said
    effective date.

2.  This agreement shall remain in effect for a primary term of 12
    months, beginning _August 1, 2001_, and for an indefinite period
    thereafter unless and until either party shall notify the other in
    writing of its desire to terminate this agreement at least 30 days
    prior to expiration of the primary term, or prior to any desired
    termination date thereafter; provided, however, that this
    agreement may be terminated at any time without notice on account
    of breach or default of the terms of this agreement. If for any
    reason Lessee does not lease said refueling equipment, including
    any additional refueling equipment leased hereunder or substituted
    refueling equipment exchanged at the request of Lessee, for at
    least 12 months per unit from the time of delivery of each unit,
    Lessee agrees to pay Lessor a sum equal to twice the cost of
    delivering said refueling equipment to Lessee. Said sum shall not
    exceed $_2,000.00_ per unit.

- 1 -    LA Rev 10/96

3.  Said refueling equipment shall in no way become the property of Lessee, or anyone claiming thereunder; and shall be used solely by Lessee on the  Stewart Intl Airport (SWF), New Windsor, NY  for handling the aviation fuel supplied Lessee by Lessor.  Said refueling equipment shall not be removed from the above specified location without the prior written consent of Lessor.

4.  Prior to the delivery of each unit of refueling equipment covered by this agreement, Lessee shall obtain and maintain in force at all times during the term of this agreement automobile liability insurance with combined single limit of not less than $1,000,000 per accident, or such higher limits as may be required by state or federal law or regulation with Lessor specified as a co-insured under the policy.  Lessee shall furnish Lessor with certificates evidencing such insurance.  Insofar as collision and comprehensive coverages are concerned, Lessee is responsible for only the first $2,000 of liability for each incident. and Lessee may insure such liability or not as it chooses.  Lessor is responsible for all collision and/or comprehensive coverage in excess of $2,000.

5.  It is understood and agreed that Lessee will not encumber said refueling equipment or do or permit anything to prejudice the title of Lessor thereto; will comply with all laws, ordinances and regulations applicable to the refueling equipment including the instructions contained in the Product Warning Bulletin attached hereto; and Lessee agrees to release, indemnify and hold Lessor harmless from and against any and all claims, liabilities, loss. obligations and causes of action for injury to or death of any and all persons, or for damage to or destruction of any or all property arising out of or resulting from the condition, existence, use or maintenance of such refueling equipment, including, but not limited to. loss or damage to the refueling equipment, whether or not any of same shall result in whole or in part from the negligence of Lessor or those acting under it.  SAID REFUELING EQUIPMENT IS LEASED "AS IS" WITHOUT WARRANTY AS TO MERCHANTABILITY, CONDITION OR FITNESS FOR ANY PURPOSE. It is also agreed that Lessee shall not add to or remove from said refueling equipment any equipment or appurtenances without the written consent of Lessor.

6.  It is further understood and agreed that each party accepts the applicable responsibilities for operating and maintaining said refueling equipment listed in the attachment hereto, said list being made a part hereof by reference.  Lessor shall be permitted access to inspect the refueling equipment at all reasonable times.

7.  Lessee agrees that it shall return said refueling equipment to Lessor at the termination of this agreement in as good condition as when Lessee received it, normal wear and tear excepted.

NOV-30-2004 15:22          843367  55          CAS HANDLING INC          P.21/24
    02/13/2003 16:52     843367  55                       919-741  971          PAGE 04/05
                                   (                                            P.4
                              jtaylor

8.   This agreement supersedes and takes the place of all former
     agreements, and amendments thereto, heretofore entered into
     between the parties covering the lease of refueling equipment at
     the location above stated.

9.   When duly executed, this agreement shall be binding upon and shall
     inure to the benefit of the parties hereto, their respective
     heirs, executors, administrators, successors and assigns;
     provided, however, that Lessee shall not assign this agreement in
     whole or in part without the prior written consent of Lessor: and
     provided further that Lessor's consent shall not be unreasonably
     withheld if reasonable requirements imposed by Lessor are first
     met.  If Lessee is a corporation, partnership, or other business
     entity, the sale, assignment or other disposition or transfer of
     any interest in such entity shall be deemed an assignment of this
     agreement or rights thereunder for purposes of this paragraph.

     EXECUTED this date, _____ 8-1-01 _____


PHILLIPS 66 COMPANY, a division          C.A.S. HANDLING, INC.
  of Phillips Petroleum Company

By _____          By _____
        Lessor                                Lessee
     Allen M. Bretz                     Ron C. Boccardo Jr
                                        VICE-PRESIDENT


_____                 _____
      Witness                              Witness


                          - 3 -                    LA Rev 10/96

NOV-30-2004 15:22                    CAS HANDLING INC                    P.21/24
                                         918-74 971                        P.4

                    (
                  jtaylor

8.    This agreement supersedes and takes the place of all former agreements, and amendments thereto, heretofore entered into between the parties covering the lease of refueling equipment at the location above stated.

9.    When duly executed, this agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns; provided, however, that Lessee shall not assign this agreement in whole or in part without the prior written consent of Lessor; and provided further that Lessor's consent shall not be unreasonably withheld if reasonable requirements imposed by Lessor are first met. If Lessee is a corporation, partnership, or other business entity, the sale, assignment or other disposition or transfer of any interest in such entity shall be deemed an assignment of this agreement or rights thereunder for purposes of this paragraph.

EXECUTED this date, _____ 8-1-01 _____

PHILLIPS 66 COMPANY, a division          C.A.S. HANDLING, INC.
of Phillips Petroleum Company

By _Allen M. Bretz_                      By _Roy C. Buey_
        Lessor                                   Lessee
                                         Ron C. Boccardo Jr
Allen M. Bretz                           VICE-PRESIDENT


_____                      _____
       Witness                                  Witness


                        - 3 -                LA Rev 10/96

# LESSEE RESPONSIBILITIES

1.  Furnish all automotive gasoline for refueling equipment.  **Do not use Avgas in the refueler.** All damage to the engine and related expenses caused by the use of Avgas in the refueler will be paid by the Lessee.

2.  Check and maintain sufficient supply of Phillips (or equivalent) recommended lubricating oil in crankcase.

3.  Check regularly and maintain sufficient supply of Phillips (or equivalent) lubricants in transmission and differential.

4.  Check battery water level weekly.  Test and charge battery as necessary and replace when needed.

5.  Maintain proper air pressure in tires, and make all necessary tire changes and repairs.  Furnish and install all replacement tires: new on the front and recaps on the rear.

6.  Check and maintain adequate all season anti-freeze in radiator to protect cooling system properly.  Anti-freeze shall be maintained in refueling equipment throughout the year.

7.  Keep all fire extinguishers fully charged and in good working order.

8.  Pay for meter calibration required by city, county or state authority. (Initial calibration when refueler is delivered to Lessee will be paid by Lessor.)

9.  Inspect nozzle screens daily and clean as necessary.  Excessive damage to nozzles due to neglect, dragging, etc., will be billed to the Lessee.

10. Furnish any ladders desired by Lessee.

11. Reimburse Lessor for replacement of parts or equipment lost from refueler equipment, and for all expense incurred for repairs to, and/or replacement of parts of, the refueling equipment necessary because of damage or excess wear to equipment through carelessness, abuse or neglect.  Reimburse Lessor for the first $2,000.00 of expenses per incident due to accidental damages.

12. Wash and clean refueler as necessary to maintain good appearance.  Cab interior and module compartments should be kept free of combustible material such as oily rags, paper, etc.

13. Pay any airport fees for the privilege of operating the refueling equipment on the airport property, or state license fees required because of operations beyond the airport perimeter, where such operations beyond the airport perimeter have been authorized by Lessor.

14. Advise Lessor at once if operation of truck or fueling system indicates need for repairs which are Lessor's responsibility.  Cost of local repairs or replacements by others will not be paid or reimbursed by Lessor unless prior authorization is secured from Lessor.

# LESSEE RESPONSIBILITIES

1. Furnish all automotive gasoline for refueling equipment. **Do not use Avgas in the refueler.** All damage to the engine and related expenses caused by the use of Avgas in the refueler will be paid by the Lessee.

2. Check and maintain sufficient supply of Phillips (or equivalent) recommended lubricating oil in crankcase.

3. Check regularly and maintain sufficient supply of Phillips (or equivalent) lubricants in transmission and differential.

4. Check battery water level weekly. Test and charge battery as necessary and replace when needed.

5. Maintain proper air pressure in tires, and make all necessary tire changes and repairs. Furnish and install all replacement tires: new on the front and recaps on the rear.

6. Check and maintain adequate all season anti-freeze in radiator to protect cooling system properly. Anti-freeze shall be maintained in refueling equipment throughout the year.

7. Keep all fire extinguishers fully charged and in good working order.

8. Pay for meter calibration required by city, county or state authority. (Initial calibration when refueler is delivered to Lessee will be paid by Lessor.)

9. Inspect nozzle screens daily and clean as necessary. Excessive damage to nozzles due to neglect, dragging, etc., will be billed to the Lessee.

10. Furnish any ladders desired by Lessee.

11. Reimburse Lessor for replacement of parts or equipment lost from refueler equipment, and for all expense incurred for repairs to, and/or replacement of parts of, the refueling equipment necessary because of damage or excess wear to equipment through carelessness, abuse or neglect. Reimburse Lessor for the first $2,000.00 of expenses per incident due to accidental damages.

12. Wash and clean refueler as necessary to maintain good appearance. Cab interior and module compartments should be kept free of combustible material such as oily rags, paper, etc.

13. Pay any airport fees for the privilege of operating the refueling equipment on the airport property, or state license fees required because of operations beyond the airport perimeter, where such operations beyond the airport perimeter have been authorized by Lessor.

14. Advise Lessor at once if operation of truck or fueling system indicates need for repairs which are Lessor's responsibility. Cost of local repairs or replacements by others will not be paid or reimbursed by Lessor unless prior authorization is secured from Lessor.

OCT 19 2001 2:14PM    HP LASERJET 3200                                    P.2

# DEALER STORAGE AGREEMENT

THIS AGREEMENT, made and entered into this 6th day of August, 2001, by and between C.A.S. Handling, Inc. ("FBO"), a corporation organized and existing under and by virtue of the laws of the State of New York with a principal office located at Stewart International Airport, 1037 First Street, Bldg. 140, New Windsor, New York 12553, and PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company ("Phillips"), a Delaware corporation with an office in Bartlesville, Oklahoma;

## WITNESSETH:

WHEREAS, Phillips has supply contracts with various commercial customers, such as airlines and air freight companies, to provide aviation fuel at certain locations, one of which is FBO's location; and

WHEREAS, FBO has, under separate contract, agreed to deliver the fuel Phillips sells to such commercial customers, and in connection therewith is willing to also store such fuel for Phillips and maintain an inventory thereof until it is delivered to carriers requesting Phillips products.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants to be performed by the parties herein, it is agreed as follows:

1. FBO shall store for Phillips aviation fuel belonging to Phillips, and shall deliver such fuel only as directed by Phillips and carrier. FBO represents that it leases and maintains adequate facilities to perform the services called for herein, including storage tanks, pumps, meters, filters, fill and discharge mechanisms, and refueler trucks which are suitable to meet current aviation and petroleum standards for storing, pumping, filtering and dispensing aviation fuels. FBO will manage Phillips' fuel inventory in a manner that provides adequate supply to meet anticipated fuel demand by Phillips' into-plane customers, but that minimizes Phillips' fuel in FBO's storage. Phillips' concurrence shall not be required for fuel ordered by FBO hereunder, unless Phillips notifies FBO that such concurrence will be required. FBO agrees to have storage space available to accommodate Phillips' needs; however, maximum amounts in storage may be limited at FBO's discretion. Phillips may inspect FBO's facilities at any time and from time to time to verify the adequacy of facilities, quality control procedures and practices, and quantity of Phillips' fuel in storage subject to written notice fixed to FBO at least 24 hours prior to inspection.

2. This Agreement shall commence on the date first set forth above and remain in full force and effect for one year and thereafter from year to year; provided that, either party at any time may cancel the contract by giving the other party thirty (30) days written notice of cancellation; provided further that, this agreement shall automatically terminate upon termination of the Branded Aviation Dealer Sales Agreement between the parties hereto. Upon cancellation or termination of this Agreement, the FBO and Phillips will balance the account using the following procedure: Any fuel belonging to Phillips which remains in FBO's storage shall be purchased by FBO at the price in effect on the most recent shipment day on which the Phillips-owned product was originally loaded at the terminal. In the event of a deficit storage balance, Phillips shall credit the FBO's account for such deficit using the price in effect on the most recent shipment day on which the FBO's own general aviation product was originally loaded at the terminal. In either event, each preceding shipment day will be used if more than one load is required to balance the account.

3. There shall be no fee charged Phillips by FBO for storage under this Agreement. All fees or charges to be paid by Phillips to FBO shall accrue under the terms of other agreements between the parties, including the Dealer Service Charge Agreement.

1

OCT 19 2001 2:14PM    HP LASERJET 3200                                    P.2

# DEALER STORAGE AGREEMENT

THIS AGREEMENT, made and entered into this 6th day of August, 2001, by and between C.A.S. Handling, Inc. ("FBO"), a corporation organized and existing under and by virtue of the laws of the State of New York with a principal office located at Stewart International Airport, 1037 First Street, Bldg. 140, New Windsor, New York 12553, and PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company ("Phillips"), a Delaware corporation with an office in Bartlesville, Oklahoma;

**WITNESSETH:**

WHEREAS, Phillips has supply contracts with various commercial customers, such as airlines and air freight companies, to provide aviation fuel at certain locations, one of which is FBO's location; and

WHEREAS, FBO has, under separate contract, agreed to deliver the fuel Phillips sells to such commercial customers, and in connection therewith is willing to also store such fuel for Phillips and maintain an inventory thereof until it is delivered to carriers requesting Phillips products.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants to be performed by the parties herein, it is agreed as follows:

1. FBO shall store for Phillips aviation fuel belonging to Phillips, and shall deliver such fuel only as directed by Phillips and carrier. FBO represents that it leases and maintains adequate facilities to perform the services called for herein, including storage tanks, pumps, meters, filters, fill and discharge mechanisms, and refueler trucks which are suitable to meet current aviation and petroleum standards for storing, pumping, filtering and dispensing aviation fuels. FBO will manage Phillips' fuel inventory in a manner that provides adequate supply to meet anticipated fuel demand by Phillips' into-plane customers, but that minimizes Phillips' fuel in FBO's storage. Phillips' concurrence shall not be required for fuel ordered by FBO hereunder, unless Phillips notifies FBO that such concurrence will be required. FBO agrees to have storage space available to accommodate Phillips' needs, however, maximum amounts in storage may be limited at FBO's discretion. Phillips may inspect FBO's facilities at any time and from time to time to verify the adequacy of facilities, quality control procedures and practices, and quantity of Phillips' fuel in storage subject to written notice faxed to FBO at least 24 hours prior to inspection.

2. This Agreement shall commence on the date first set forth above and remain in full force and effect for one year and thereafter from year to year, provided that, either party at any time may cancel the contract by giving the other party thirty (30) days written notice of cancellation; provided further that, this agreement shall automatically terminate upon termination of the Branded Aviation Dealer Sales Agreement between the parties hereto. Upon cancellation or termination of this Agreement, the FBO and Phillips will balance the account using the following procedure: Any fuel belonging to Phillips which remains in FBO's storage shall be purchased by FBO at the price in effect on the most recent shipment day on which the Phillips-owned product was originally loaded at the terminal. In the event of a deficit storage balance, Phillips shall credit the FBO's account for such deficit using the price in effect on the most recent shipment day on which the FBO's own general aviation product was originally loaded at the terminal. In either event, each preceding shipment day will be used if more than one load is required to balance the account.

3. There shall be no fee charged Phillips by FBO for storage under this Agreement. All fees or charges to be paid by Phillips to FBO shall accrue under the terms of other agreements between the parties, including the Dealer Service Charge Agreement.

1

Agmt - Dealer Storage                                                    1/1/2000

OCT 19 2001 2:14PM    HP LASERJET 3200                                      P.4

10. All notices shall be directed to the parties as indicated hereinbelow by certified or registered mail, return receipt requested, or electronically, or to such other address as a party may designate to the other in writing.

FBO: CAS Handling, Inc.                    Phillips:  PHILLIPS PETROLEUM COMPANY
Stewart International Airport                         Attn: Manager, Aviation Marketing
1037 First Street                                    611 Adams Building
Bldg. 148                                            Bartlesville, OK 74004
New Windsor, NY 12553

Notices sent by mail shall be effective when deposited in the U.S. mail, postage prepaid and properly addressed. Any other notice shall be effective when received.

11. This Agreement shall not be assignable by either party except with the written consent of the other. This Agreement and the provisions hereof shall be subject to all applicable state and federal laws and to all rules, regulations, orders and directives of any governmental authority, agency, commission or regulatory body in connection with any and all matters or things under or incident to this Agreement. This Agreement embodies the entire agreement between the parties regarding the subject matter hereof, and there are no promises, assurances, terms, conditions or obligations, whether by precedent or otherwise, other than those contained herein. No variation, modification or reformation hereof shall be deemed valid unless signed by the parties hereto with the same formality as this Agreement.       This contract shall not be binding on Seller unless and until signed by Seller's authorized representative. Commencement of performance hereunder prior to signing by Seller, as herein stipulated, shall in no case be construed as a waiver by Seller of this requirement.

EXECUTED the day and year first above written.

C.A.S. Handling, Inc. (FBO)                PHILLIPS 66 COMPANY, a division of
                                           PHILLIPS PETROLEUM COMPANY

By _____                 By _____
   Rodney Boccadoro, Jr.                       Keith D. Renean

Title  Vice President                       Title   Commercial Aviation Manager

                                   3

Agmt'- Dealer Storage                                               1/1/2000

10. All notices shall be directed to the parties as indicated hereinbelow by certified or registered mail, return receipt requested, or electronically, or to such other address as a party may designate to the other in writing.

FBO: CAS Handling, Inc.                     Phillips: PHILLIPS PETROLEUM COMPANY
Stewart International Airport                          Attn: Manager, Aviation Marketing
1037 First Street                                     611 Adams Building
Bldg. 140                                            Bartlesville, OK 74004
New Windsor, NY 12553

Notices sent by mail shall be effective when deposited in the U.S. mail, postage prepaid and properly addressed. Any other notice shall be effective when received.

11. This Agreement shall not be assignable by either party except with the written consent of the other. This Agreement and the provisions hereof shall be subject to all applicable state and federal laws and to all rules, regulations, orders and directives of any governmental authority, agency, commission or regulatory body in connection with any and all matters or things under or incident to this Agreement. This Agreement embodies the entire agreement between the parties regarding the subject matter hereof, and there are no promises, assurances, terms, conditions or obligations, whether by precedent or otherwise, other than those contained herein. No variation, modification or reformation hereof shall be deemed valid unless signed by the parties hereto with the same formality as this Agreement. This contract shall not be binding on Seller unless and until signed by Seller's authorized representative. Commencement of performance hereunder prior to signing by Seller, as herein stipulated, shall in no case be construed as a waiver by Seller of this requirement.

EXECUTED the day and year first above written.

C.A.S. Handling, Inc. (FBO)                  PHILLIPS 66 COMPANY, a division of
                                             PHILLIPS PETROLEUM COMPANY

By _____                  By _____
     Rodney Boccadoro, Jr.                        Keith D. Renean

Title  Vice President                        Title  Commercial Aviation Manager



NOV-30-2004  15:12                    Contract 30033201                          P.02/24

## BRANDED AVIATION DEALER SALES CONTRACT

This contract is by and between PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company ("Phillips") and

C.A.S. HANDLING, INC.  ("Buyer").

WHEREAS, Phillips refines and markets aviation fuels; and

WHEREAS, Phillips is willing to sell to Buyer and Buyer is willing to buy such products for resale, subject to the terms hereof;

NOW THEREFORE, in consideration of the mutual promises set out below, Phillips and Buyer agree as follows:

1.    DEFINITIONS.

a.    "brand" means any and all trademarks, servicemarks, logotypes, emblems and other commercial symbols.  A product is "branded" if a brand is on it or its container or is displayed in association with it.

b.    "contract year" means a period of 12 months beginning on an anniversary date of this contract.

c.    "estimated maximum quantities" or "EMQ" means quantities of Products which Buyer and Phillips have initially agreed upon, based on their estimates of anticipated availability of Products from Phillips and upon their estimates of anticipated need for Products by Buyer.  The parties stipulate that these estimates are necessary and reasonable in order for Phillips to plan supply operations.

d.    "imprinter" means a Phillips 66 issued seven monetary digit credit card imprinter together with its numbered imprinter plate.

e.    "Phillips' sign" means any sign, emblem, decal, graphic representation or other rendition of any Phillips brand.

f.    "Phillips products" means any petroleum products sold under a Phillips brand.  The term includes, without limitation, Products as defined in g. below.

g.    "Products" means those petroleum products sold by Phillips to Buyer under this contract.

2.    TERM.

The term of this contract shall begin on 08/01/2001 and shall end on 07/31/2004, unless otherwise cancelled by either party giving ninety (90) days advance written notice to the other party.

3.    SALE AND PURCHASE.

a.    Subject to other pertinent provisions of this contract, Phillips shall sell, and Buyer shall purchase, for each contract year of this contract, the Products and estimated quantities identified on Attachment I, attached hereto and incorporated herein by this reference.  Upon thirty days written notice, Buyer shall have the right to request a change in the quantities listed on Attachment I to reflect projected actual requirements.  If Buyer requests a change for any month which is greater than 15%, the requested change shall be subject to Phillips' consent.  Otherwise, such requested changes shall become effective on the date designated by the Buyer.

b.    Phillips is obligated, subject to availability of fuels and to the terms, provisions and limitations contained in this contract, to supply Products up to but not in excess of, the estimated maximum quantities specified in Subparagraph 3a, above during the respective month(s) of the term; however, the parties recognize that from time to time Buyer may desire to purchase quantities of Products during a given month in excess of or less than the specified quantities.  Buyer shall place orders for Products so as to permit deliveries in substantially equal increments through each month.  Should Phillips agree to sell Buyer Products during any particular month in excess of the specified quantities for that month, Phillips may at its discretion reduce the specified or permitted quantities in the ensuing month(s) by an amount equal to the excess sold to Buyer.

4.    DELIVERIES AND SHIPMENTS.

a.    Phillips shall deliver Products to Buyer in no less than transport truck lots at or from supply sources designated by Phillips. Deliveries shall be made during the normal operating hours for each such supply source.  Delivery shall be on a point of origin or destination basis at Phillips' option.  From time to time

     Contract 30033201      11-19-01                    P.02/24

                                                                        11-19-01

# BRANDED AVIATION DEALER SALES CONTRACT

This contract is by and between PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company ("Phillips") and

**C.A.S. HANDLING, INC.  ["Buyer"].**

WHEREAS, Phillips refines and markets aviation fuels; and

WHEREAS, Phillips is willing to sell to Buyer and Buyer is willing to buy such products for  resale, subject to the terms hereof;

NOW THEREFORE, in consideration of the mutual promises set out below, Phillips and Buyer agree as follows:

**1.    DEFINITIONS.**

a.    "brand" means any and all trademarks, servicemarks, logotypes, emblems and other commercial symbols.  A product is "branded" if a brand is on it or its container or is displayed in association with it.

b.    "contract year" means a period of 12 months beginning on an anniversary date of this contract.

c.    "estimated maximum quantities" or "EMQ" means quantities of Products which Buyer and Phillips have initially agreed upon, based on their estimates of anticipated availability of Products from Phillips and upon their estimates of anticipated need for Products by Buyer.  The parties stipulate that these estimates are necessary and reasonable in order for Phillips to plan supply operations.

d.    "imprinter" means a Phillips 66 issued seven monetary digit credit card imprinter together with its numbered imprinter plate.

e.    "Phillips' sign" means any sign, emblem, decal, graphic representation or other rendition of any Phillips brand.

f.    "Phillips products" means any petroleum products sold under a Phillips brand.  The term includes, without limitation, Products as defined in g. below.

g.    "Products" means those petroleum products sold by Phillips to Buyer under this contract.

**2.    TERM.**

The term of this contract shall begin on 08/01/2001 and shall end on 07/31/2004, unless otherwise cancelled by either party giving ninety (90) days advance written notice to the other party.

**3.    SALE AND PURCHASE.**

a.    Subject to other pertinent provisions of this contract, Phillips shall sell, and Buyer shall purchase, for each contract year of this contract, the Products and estimated quantities identified on Attachment I, attached hereto and incorporated herein by this reference. Upon thirty days written notice, Buyer shall have the right to request a change in the quantities listed on Attachment I to reflect projected actual requirements. If Buyer requests a change for any month which is greater than 15%, the requested change shall be subject to Phillips' consent. Otherwise, such requested changes shall become effective on the date designated by the Buyer.

b.    Phillips is obligated, subject to availability of fuels and to the terms, provisions and limitations contained in this contract, to supply Products up to but not in excess of, the estimated maximum quantities specified in Subparagraph 3a. above during the respective month(s) of the term; however, the parties recognize that from time to time Buyer may desire to purchase quantities of Products during a given month deliveries in substantially equal increments through each month. Should Phillips agree to sell Buyer Products in excess of or less than the specified quantities.  Buyer shall place orders for Products so as to permit during any particular month in excess of the specified quantities for that month, Phillips may at its discretion reduce the specified or permitted quantities in the ensuing month(s) by an amount equal to the excess sold to Buyer.

**4.    DELIVERIES AND SHIPMENTS.**

a.    Phillips shall deliver Products to Buyer in no less than transport truck lots at or from supply sources designated by Phillips. Deliveries shall be made during the normal operating hours for each such supply source.  Delivery shall be on a ~~point of origin or~~ destination basis ~~at Phillips' option~~. From time to time

c.    Phillips may assess a delinquency charge on all overdue sums owing to Phillips.  Such delinquency charge shall be determined in accordance with applicable law and Phillips' established delinquency charge policy in effect on the date of delivery.  If Buyer fails to comply with payment requirements, Phillips may suspend deliveries until Buyer pays all sums due hereunder.

**8.    STANDARDS.**

a.    In addition to compliance with all safety, environmental, and other pertinent laws and regulations, Buyer shall comply with Phillips' standards at all times.  Phillips retains the right to revise such standards at any time and from time to time.  Buyer shall have a reasonable time after notice thereof to comply with any such revisions. This contract is contingent upon the buyers receipt of said standards within 7 days of execution.

b.    Phillips may enter upon Buyer's premises at any time and from time to time during normal business hours for the purpose of inspecting to verify Buyer's compliance with this Paragraph 8, subject to fixed notice to the buyer at least 24 hours prior to entry.

**9.    CREDIT CARD CHARGES.**

a.    Phillips is not obligated to continue in effect any credit card program, but while it does Phillips will accept credit card charges made in accordance with the terms of the Phillips 66 Aviation Credit Card Directory by authorized holders of credit cards approved by Phillips at locations authorized to accept such charges.  Phillips may revise any part of its Aviation Credit Card Directory from time to time.  The Phillips 66 Aviation Credit Card Directory is incorporated herein by reference, and Buyer's violation of its terms is a breach of this contract which entitles Phillips to charge the invoices involved back to Buyer's account. This contract is contingent upon the buyers receipt of said directory within 7 days of execution.

b.    If Buyer's credit card transactions are to be processed electronically in conjuction with the Phillips 66 Credit Card Center in Bartlesville, then Attachment II, providing the terms and conditions pertaining to such electronic processing, is attached hereto and incorporated herein by reference.

**10.    TRADEMARKS AND BRANDS.**

a.    Phillips hereby permits Buyer to use and display Phillips' brands, in accordance with the terms of this contract.  Phillips retains all right, title and interest in Phillips' brands, and in any goodwill associated therewith.  Buyer acknowledges that Phillips' brand rights are valuable assets.  Buyer shall use and display Phillips' brands solely in the manner which Phillips prescribes or approves.

b.    Upon termination or non-renewal of this contract, Buyer shall immediately stop using in any manner any Phillips signs or brands.  Nothing herein shall be deemed a lease or license by Phillips of its brands.

c.    Buyer shall protect Phillips' brand rights.

(i)    Buyer shall not allow at any of its Phillips branded locations any activities or merchandise which are illegal or morally offensive or which otherwise bring Phillips' brand into disrepute.  Buyer shall not engage in any other activities, whether similar or dissimilar to those described in the previous sentence, which impair or violate Phillips' brand rights.

(ii)    Buyer shall not sell or offer for sale any petroleum products which are not Phillips products ("other product") under any Phillips brand or any brand confusingly similar to a Phillips brand or under circumstances which would lead the public to believe such products are Phillips products.  Buyer shall not (1) mix, blend, or dilute any Phillips product with any other product or with any other Phillips' product without Phillips' prior consent, (2) sell or offer any other product as being a Phillips product, or (3) alter, contaminate, adulterate or mislabel any Phillips product in any manner.

If Buyer violates any part of this Paragraph, Phillips may terminate Buyer's right to use or display Phillips' signs or brands and may remove any Phillips signs and imprinters which may be in place.

d.    If Buyer purchases any petroleum products other than Phillips products, Buyer shall keep such products segregated from Phillips products.*  Buyer shall transport, store, distribute and sell such other products in such manner as to avoid any misunderstanding by the public that such products might be Phillips products. * except for co-mingled product pursuant to dealer service charge agreement.

provided product always meets ATA and AFTM standards
e.    Phillips may at any time alter any Phillips brands/  If Phillips discontinues marketing any brands of Products in any area where Phillips markets, Phillips shall be relieved of all obligation to sell or deliver such discontinued brands of Products to Buyer; however, any other brands of Products which replace discontinued brands shall be covered by this contract.

f.    Phillips, its agents and contractors may enter any location of Buyer in order to interview employees, to inspect, test, sample or do other things permitted under this contract, and to remove Phillips signs and imprinters under Paragraphs 11 and 12, respectively., subject to fixed notice to the buyers at least 24 hours prior to entry and provides Phillips agent is under escort by buyer

iii

c.    Phillips may assess a delinquency charge on all overdue sums owing to Phillips.  Such delinquency charge shall be determined in accordance with applicable law and Phillips' established delinquency charge policy in effect on the date of delivery.  If Buyer fails to comply with payment requirements, Phillips may suspend deliveries until Buyer pays all sums due hereunder.

8.    STANDARDS.

a.    In addition to compliance with all safety, environmental, and other pertinent laws and regulations, Buyer shall comply with Phillips' standards at all times.  Phillips retains the right to revise such standards at any time and from time to time.  Buyer shall have a reasonable time after notice thereof to comply with any such revisions. This contract is contingent upon the buyers receipt of said standards within 7 days of execution.

b.    Phillips may enter upon Buyer's premises at any time and from time to time during normal business hours for the purpose of inspecting to verify Buyer's compliance with this Paragraph 8, subject to fixed notice to the buyer at least 24 hours prior to entry.

9.    CREDIT CARD CHARGES.

a.    Phillips is not obligated to continue in effect any credit card program, but while it does Phillips will accept credit card charges made in accordance with the terms of the Phillips 66 Aviation Credit Card Directory by authorized holders of credit cards approved by Phillips at locations authorized to accept such charges.  Phillips may revise any part of its Aviation Credit Card Directory from time to time.  The Phillips 66 Aviation Credit Card Directory is incorporated herein by reference, and Buyer's violation of its terms is a breach of this contract which entitles Phillips to charge the invoices involved back to Buyer's account. This contract is contingent upon the buyers receipt of said directory within 7 days of execution.

b.    If Buyer's credit card transactions are to be processed electronically in conjuction with the Phillips 66 Credit Card Center in Bartlesville, then Attachment II, providing the terms and conditions pertaining to such electronic processing, is attached hereto and incorporated herein by reference.

10.    TRADEMARKS AND BRANDS.

a.    Phillips hereby permits Buyer to use and display Phillips' brands, in accordance with the terms of this contract.   Phillips retains all right, title and interest in Phillips' brands, and in any goodwill associated therewith.   Buyer acknowledges that Phillips' brand rights are valuable assets. Buyer shall use and display Phillips' brands solely in the manner which Phillips prescribes or approves.

b.    Upon termination or non-renewal of this contract, Buyer shall immediately stop using in any manner any Phillips signs or brands.  Nothing herein shall be deemed a lease or license by Phillips of its brands.

c.    Buyer shall protect Phillips' brand rights.

(i)    Buyer shall not allow at any of its Phillips branded locations any activities or merchandise which are illegal or morally offensive or which otherwise bring Phillips' brand into disrepute.  Buyer shall not engage in any other activities, whether similar or dissimilar to those described in the previous sentence, which impair or violate Phillips' brand rights.

(ii)    Buyer shall not sell or offer for sale any petroleum products which are not Phillips products ("other product") under any Phillips brand or any brand confusingly similar to a Phillips brand or under circumstances which would lead the public to believe such products are Phillips products.  Buyer shall not (1) mix, blend, or dilute any Phillips product with any other product or with any other Phillips' product without Phillips' prior consent, (2) sell or offer any other product as being a Phillips product, or (3) alter, contaminate, adulterate or mislabel any Phillips product in any manner.

If Buyer violates any part of this Paragraph, Phillips may terminate Buyer's right to use or display Phillips' signs or brands and may remove any Phillips signs and imprinters which may be in place.

d.    If Buyer purchases any petroleum products other than Phillips products, Buyer shall keep such products segregated from Phillips products.*  Buyer shall transport, store, distribute and sell such other products in such manner as to avoid any misunderstanding by the public that such products might be Phillips products. * except for co-mingled product pursuant to dealer service charge agreement. provided product always meets AIA and AFM standards

e.    Phillips at any time alter any Phillips brands.  If Phillips discontinues marketing any brands of Products in any area where Buyer markets, Phillips shall be relieved of all obligation to sell or deliver such discontinued brands of Products to Buyer; however, any other brands of Products which replace discontinued brands shall be covered by this contract.

f.    Phillips, its agents and contractors may enter any location of Buyer in order to interview employees, to inspect, test, sample or do other things permitted under this contract, and to remove Phillips signs and imprinters under Paragraphs 11 and 12, respectively., subject to fixed notice to the buyers at least 24 hours prior to entry and provides Phillips agent is under escort by buyer

iii

no liability for not performing such obligations.  Force Majeure does not extend the term of this contract.

b.    "Force Majeure" shall include all causes beyond the control of the prevented party, including, without limitation, acts of God, war, orders or requests of government, strike, lockout, labor disputes or shortages, failures, delays or unavailability of transportation, or reduction or unavailability of Products at Buyer's designated supply source or at Phillips' supply source, or reduction or unavailability of any product or material necessary to make Products.

16.   RELATIONSHIP OF PARTIES.

This is a sales contract.  Neither Buyer nor Buyer's employees are joint venturers, partners, agents or employees of Phillips.  Neither Phillips nor Buyer is authorized to represent, obligate or bind the other. Nothing in this contract shall be construed as giving Phillips any right to exercise any control over Buyer's operations or over the manner and method by which Buyer conducts its operations.

17.   INDEMNIFICATION.

Phillips shall not be liable for any acts or omissions of Buyer, its employees or agents.  Buyer shall defend, indemnify and save Phillips, its affiliated companies and their agents and employees harmless from and against any and all liabilities, claims, judgments, costs and expenses (including, without limitation, court costs and attorneys' fees) for injury to or death of any person (including, without limitation, Buyer or Buyer's employees, agents, or customers), or for damage to or destruction of any property, where such injury, death, damage or destruction directly or indirectly arises out of this contract, Buyer's business, the storage, handling, transportation, sale or use of any Products purchased hereunder, or the use of signs furnished hereunder. The foregoing obligation to defend, indemnify and save Phillips, its affiliated companies and their employees and agents harmless shall not apply to incidents proximately caused by the sole negligence of Phillips, its affiliated companies, their employees or agents, nor to incidents proximately caused in part by the negligence of Phillips, its affiliated companies, their agents or employees.

18.   COMPLIANCE WITH LAW.

Buyer shall observe all applicable laws, regulations and orders and shall indemnify Phillips for any fine, penalty or liabilities, and for any costs related thereto, including, without limitation, court costs and attorneys' fees, arising out of any failure by Buyer to observe any law, regulation or order.

19.   APPLICABLE LAW AND CONFLICT RESOLUTION.

a.    THE INTERPRETATION AND PERFORMANCE OF THIS CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF OKLAHOMA EXCEPT FOR ANY RULE OF OKLAHOMA LAW WHICH WOULD MAKE THE LAW OF ANY OTHER JURISDICTION APPLICABLE.

b.    In respect of any dispute concerning this contract, performance hereunder or breach hereof, the parties hereto irrevocably submit to the non-exclusive jurisdiction of the District Court of Washington County, Oklahoma.

20.   ASSIGNMENTS.

This contract shall inure to the benefit of and shall bind the parties and their respective successors and assigns.  Phillips has contracted with Buyer in reliance on the personal skills and qualifications of Buyer or of Buyer's principal owners or officers.  Because of the personal nature of this contract,

a.    if Buyer is a sole proprietor, Buyer shall not assign this contract in whole or in part;

b.    if Buyer is a partnership, no sale or other transfer of any partner's interest shall be made; or

c.    if Buyer is a corporation or joint stock company, no sale or other transfer of more than 40% of any class of shares shall be made, without the prior consent of Phillips.  Any assignment, sale or transfer without such consent is a breach of this contract.

21.   RECORDS AND AUDIT.

Both parties hereto shall maintain a true and correct set of records pertaining to all activities relating to their performance of this contract and all transactions related thereto.  The parties further agree to retain all such records for a period of not less than two years after completion of performance hereunder.  Any representative(s) authorized by a party may audit any and all such records of the other party at any time(s) during the term of this contract and during the two-year period after completion of performance of this contract.

no liability for not performing such obligations.  Force Majeure does not extend the term of this contract.

b.    "Force Majeure" shall include all causes beyond the control of the prevented party, including, without limitation, acts of God, war, orders or requests of government, strike, lockout, labor disputes or shortages, failures, delays or unavailability of transportation, or reduction or unavailability of Products at Buyer's designated supply source or at Phillips' supply source, or reduction or unavailability of any product or material necessary to make Products.

16.  RELATIONSHIP OF PARTIES.

This is a sales contract.  Neither Buyer nor Buyer's employees are joint venturers, partners, agents or employees of Phillips.  Neither Phillips nor Buyer is authorized to represent, obligate or bind the other. Nothing in this contract shall be construed as giving Phillips any right to exercise any control over Buyer's operations or over the manner and method by which Buyer conducts its operations.

17.  INDEMNIFICATION.

Phillips shall not be liable for any acts or omissions of Buyer, its employees or agents.  Buyer shall defend, indemnify and save Phillips, its affiliated companies and their agents and employees harmless from and against any and all liabilities, claims, judgments, costs and expenses (including, without limitation, court costs and attorneys' fees) for injury to or death of any person (including, without limitation, Buyer or Buyer's employees, agents, or customers), or for damage to or destruction of any property, where such injury, death, damage or destruction directly or indirectly arises out of this contract, Buyer's business, the storage, handling, transportation, sale or use of any Products purchased hereunder, or the use of signs furnished hereunder. The foregoing obligation to defend, indemnify and save Phillips, its affiliated companies and their employees and agents harmless shall not apply to incidents proximately caused by the sole negligence of Phillips, its affiliated companies, their employees or agents, nor to incidents proximately caused in part by the negligence of Phillips, its affiliated companies, their agents or employees.

18.  COMPLIANCE WITH LAW.

Buyer shall observe all applicable laws, regulations and orders and shall indemnify Phillips for any fine, penalty or liabilities, and for any costs related thereto, including, without limitation, court costs and attorneys' fees, arising out of any failure by Buyer to observe any law, regulation or order.

19.  APPLICABLE LAW AND CONFLICT RESOLUTION.

a.    THE INTERPRETATION AND PERFORMANCE OF THIS CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF OKLAHOMA EXCEPT FOR ANY RULE OF OKLAHOMA LAW WHICH WOULD MAKE THE LAW OF ANY OTHER JURISDICTION APPLICABLE.

b.    In respect of any dispute concerning this contract, performance hereunder or breach hereof, the parties hereto irrevocably submit to the non-exclusive jurisdiction of the District Court of Washington County, Oklahoma.

20.  ASSIGNMENTS.

This contract shall inure to the benefit of and shall bind the parties and their respective successors and assigns.  Phillips has contracted with Buyer in reliance on the personal skills and qualifications of Buyer or of Buyer's principal owners or officers.  Because of the personal nature of this contract,

a.    if Buyer is a sole proprietor, Buyer shall not assign this contract in whole or in part;

b.    if Buyer is a partnership, no sale or other transfer of any partner's interest shall be made; or

c.    if Buyer is a corporation or joint stock company, no sale or other transfer of more than 40% of any class of shares shall be made, without the prior consent of Phillips.  Any assignment, sale or transfer without such consent is a breach of this contract.

21.  RECORDS AND AUDIT.

Both parties hereto shall maintain a true and correct set of records pertaining to all activities relating to their performance of this contract and all transactions related thereto.  The parties further agree to retain all such records for a period of not less than two years after completion of performance hereunder.  Any representative(s) authorized by a party may audit any and all such records of the other party at any time(s) during the term of this contract and during the two-year period after completion of performance of this contract.

Contract 30D33201

ATTACHMENT I

CONTRACT VOLUMES

(QUANITIES IN THOUSANDS OF GALLONS)

| Product | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Total |
|---------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| AV GAS | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 156 |
| JET FUEL | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 756 |

Contract 30033201

ATTACHMENT I

CONTRACT VOLUMES

(QUANTITIES IN THOUSANDS OF GALLONS)

| Product | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Total |
|---------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| AV GAS  | 13  | 13  | 13  | 13  | 13  | 13  | 13  | 13  | 13  | 13  | 13  | 13  | 156   |
| JET FUEL| 63  | 63  | 63  | 63  | 63  | 63  | 63  | 63  | 63  | 63  | 63  | 63  | 756   |

## TRANSACTION PROCESSING POLICY
## DEFINITIONS

1.1    Debit Card - A card or access device issued by financial institutions which authorizes an electronic transfer of funds from the cardholder's checking, share draft and/or savings account for payment of authorized purchases.  The term Debit Card does not include the MasterCard Debit Card or the Visa Debit Card.

1.2    Credit Card - A card or other evidence of credit, authorizing the cardholder to obtain goods and services on credit.

1.3    Debit Transaction - The process of data capture, authorization and electronic transfer of funds from the cardholder's checking, share draft and/or savings account for payment of authorized purchases.

1.4    Check Transaction - The process of authorization for a check or draft written on the customer's checking, share draft and/or savings account for payment of authorized purchases.

1.5    Credit Transaction - The process of data capture and authorization allowing a customer to use a Credit Card for payment of authorized purchases.

1.6    Card Issuer - Any company which issues a credit card or a Debit Card.

1.7    NSP - Network Service Provider which at present is SPS Payment System, Inc., ("SPS") or any assignee or successor with respect to the NSP's functions related to this Policy.

## ARTICLE II
## SERVICES

2.1    Buyer shall receive on-line credit authorizations and data capture for customer purchases made by Phillips Credit Card or other Credit Cards agreed by NSP and Phillips and made in accordance with the terms of Phillips' Credit Card Directory, as applicable at the time of the purchase.  As to each Credit Transaction, Buyer shall include account number, expiration date, dollar amount of transaction, date of transaction, location of sale and other data.  The total of all such transaction data shall not exceed 250 characters.  Buyer shall pass this information on to the transaction processing system.

2.2    Buyer shall receive on-line check authorizations for customer purchases made by personal check.  As to each check transaction, Buyer shall include

# TRANSACTION PROCESSING POLICY
## DEFINITIONS

1.1   Debit Card - A card or access device issued by financial institutions which authorizes an electronic transfer of funds from the cardholder's checking, share draft and/or savings account for payment of authorized purchases.  The term Debit Card does not include the MasterCard Debit Card or the Visa Debit Card.

1.2   Credit Card - A card or other evidence of credit, authorizing the cardholder to obtain goods and services on credit.

1.3   Debit Transaction - The process of data capture, authorization and electronic transfer of funds from the cardholder's checking, share draft and/or savings account for payment of authorized purchases.

1.4   Check Transaction - The process of authorization for a check or draft written on the customer's checking, share draft and/or savings account for payment of authorized purchases.

1.5   Credit Transaction - The process of data capture and authorization allowing a customer to use a Credit Card for payment of authorized purchases.

1.6   Card Issuer - Any company which issues a credit card or a Debit Card.

1.7   NSP - Network Service Provider which at present is SPS Payment System, Inc., ("SPS") or any assignee or successor with respect to the NSP's functions related to this Policy.

## ARTICLE II
## SERVICES

2.1   Buyer shall receive on-line credit authorizations and data capture for customer purchases made by Phillips Credit Card or other Credit Cards agreed by NSP and Phillips and made in accordance with the terms of Phillips' Credit Card Directory, as applicable at the time of the purchase.  As to each Credit Transaction, Buyer shall include account number, expiration date, dollar amount of transaction, date of transaction, location of sale and other data.  The total of all such transaction data shall not exceed 250 characters.  Buyer shall pass this information on to the transaction processing system.

2.2   Buyer shall receive on-line check authorizations for customer purchases made by personal check.  As to each check transaction, Buyer shall include

2.9  Buyer shall use and maintain any information and/or data provided hereunder in such a manner that neither Phillips nor Buyer shall be considered to be a consumer reporting agency under any applicable law or regulation and so providing or requesting a consumer report as defined by any applicable law or regulation.

2.10 NSP has advised that it will make reasonable efforts to ensure that services will be available over 90 percent of the time, but NSP does not guarantee uninterrupted service and therefore neither can Phillips.  Buyer therefore releases and indemnifies Phillips and NSP from any loss, cost, expenses or damage suffered by Buyer or Buyer's customers resulting from interruption of services.

2.11 NSP has advised that it will make reasonable efforts to ensure reasonably prompt response time, but NSP does not guarantee response time and therefore neither can Phillips.  Buyer therefore releases and indemnifies Phillips and NSP from any loss, cost expense or damage, suffered by Buyer or Buyer's customers resulting from slow response time.

2.12 In no event shall Phillips be liable to Buyer for consequential damages including without limitation loss of profit where such damages are related to or connected with this Policy or any Debit, Credit or Check Transaction or lack thereof.

## ARTICLE III
## NETWORK CONFIGURATION

3.1  NSP and Phillips will arrange for leased telephone lines, or satellite communications to agreed-upon retail units at Buyer's expense.

3.2  NSP and Phillips will arrange for the installation of the diagnostic modems or equivalent equipment in the agreed-upon retail units of Buyer.  Buyer will provide adequate space and power for the operation of diagnostic modems and will grant NSP and Phillips reasonable access thereto.  Buyer shall protect the diagnostic modems from theft, vandalism, fire or other destruction, damage or loss and shall be responsible and will indemnify NSP and Phillips for loss or damage of said modems.  Buyer will provide a surge protector of sufficient quality to protect modems, interface units and POS devices from electrical variances considered controllable.

3.3  Buyer shall provide Phillips approved automated point-of-sale equipment at each agreed-upon retail unit for purposes of data capture and authorization.

3.4  NSP has reserved the right to change or modify at any time without

2.9   Buyer shall use and maintain any information and/or data provided hereunder in such a manner that neither Phillips nor Buyer shall be considered to be a consumer reporting agency under any applicable law or regulation and so providing or requesting a consumer report as defined by any applicable law or regulation.

2.10 NSP has advised that it will make reasonable efforts to ensure that services will be available over 90 percent of the time, but NSP does not guarantee uninterrupted service and therefore neither can Phillips.  Buyer therefore releases and indemnifies Phillips and NSP from any loss, cost, expenses or damage suffered by Buyer or Buyer's customers resulting from interruption of services.

2.11 NSP has advised that it will make reasonable efforts to ensure reasonably prompt response time, but NSP does not guarantee response time and therefore neither can Phillips.  Buyer therefore releases and indemnifies Phillips and NSP from any loss, cost expense or damage, suffered by Buyer or Buyer's customers resulting from slow response time.

2.12 In no event shall Phillips be liable to Buyer for consequential damages including without limitation loss of profit where such damages are related to or connected with this Policy or any Debit, Credit or Check Transaction or lack thereof.

## ARTICLE III
## NETWORK CONFIGURATION

3.1  ~~NSP and Phillips will arrange for leased telephone lines, or satellite communications to agreed upon retail units at Buyer's expense.~~

3.2  ~~NSP and Phillips will arrange for the installation of the diagnostic~~ modems or equivalent equipment in the agreed-upon retail units of Buyer.  Buyer will provide adequate space and power for the operation of diagnostic modems and will grant NSP and Phillips reasonable access thereto.  Buyer shall protect the diagnostic modems from theft, vandalism, fire or other destruction, damage or loss and shall be responsible and will indemnify NSP and Phillips for loss or damage of said modems.  Buyer will provide a surge protector of sufficient quality to protect modems, interface units and POS ~~devises from electrical variances considered controllable.~~

3.3  ~~Buyer shall provide Phillips approved automated point-of-sale equipment at each agreed upon retail unit for purposes of data capture and authorization.~~

3.4  NSP has reserved the right to change or modify at any time without

NOV-30-2004  15:18                                                    P.14/24

# SCHEDULE "A"
## OF
## TRANSACTION PROCESSING POLICY

### PHILLIPS 66 AUTOMATION PROGRAM
### FEE SCHEDULE

~~Satellite~~

~~$450.00      ONE-TIME INSTALLATION CHARGE PER LOCATION            (1)~~
~~$175.00      MONTHLY FEE (NOT INCLUDING APPLICABLE TAXES)         (2)~~

Leased Line

~~$1,500.00    ONE-TIME INSTALLATION CHARGE PER LOCATION*           (1)~~
~~$ 250.00     MONTHLY FEE~~

~~*THE LESSOR OF THE LINE MAY FOR CERTAIN LOCATIONS~~
~~CHARGE A GREATER FEE, IN WHICH CASE BUYER WILL BE~~
~~SO ADVISED PRIOR TO INSTALLATION~~

~~Autodial  (Automotive, Warehouse with Fuel)~~

~~$45.00       MONTHLY FEE~~                                         (2)

Autodial  (Aviation, Marina, Warehouse Non Fuel, Fast Lube, and Lube Center)

$15.00       MONTHLY FEE                                            (2)

THE 2.5% BANK CARD FEE FOR MASTERCARD, VISA, NOVUS, AMERICAN EXPRESS, OPTIMA, DINERS CLUB AND CARTE BLANCHE CARDS INCLUDES THE NETWORK TRANSACTION FEE COST.

THE 3% CARD FEE FOR WRIGHT EXPRESS AND VOYAGER, THE 3.5% CARD FEE FOR MULTI SERVICE, AND THE 3.25% CARD FEE FOR AVCARD INCLUDE THE NETWORK TRANSACTION FEE COST.

~~FLEETSHARE IS BASED ON QUARTERLY PRIME RATE, MINIMUM DISCOUNT RATE IS 1.5%.~~

(1)    Invoiced one time by location on the applicable monthly invoice.
(2)    Invoiced monthly to Buyer and itemized by location.

revised concept 3/1598

## SCHEDULE "A"
## OF
## TRANSACTION PROCESSING POLICY

### PHILLIPS 66 AUTOMATION PROGRAM
### FEE SCHEDULE

~~Satellite~~

~~$450.00     ONE-TIME INSTALLATION CHARGE PER LOCATION                    (1)~~
~~$175.00     MONTHLY FEE (NOT INCLUDING APPLICABLE TAXES)                  (2)~~

### Leased Line

~~$1,500.00   ONE-TIME INSTALLATION CHARGE PER LOCATION*                    (1)~~
~~$ 250.00    MONTHLY FEE~~

~~*THE LESSOR OF THE LINE MAY FOR CERTAIN LOCATIONS
CHARGE A GREATER FEE, IN WHICH CASE BUYER WILL BE
SO ADVISED PRIOR TO INSTALLATION~~

~~Autodial (Automotive, Warehouse with Fuel)~~

~~$45.00     MONTHLY FEE~~                                                   (2)

Autodial (Aviation, Marina, Warehouse Non Fuel, Fast Lube, and Lube Center)

   $15.00     MONTHLY FEE                                                   (2)

THE 2.5% BANK CARD FEE FOR MASTERCARD, VISA, NOVUS, AMERICAN EXPRESS, OPTIMA, DINERS CLUB AND CARTE BLANCHE CARDS INCLUDES THE NETWORK TRANSACTION FEE COST.

THE 3% CARD FEE FOR WRIGHT EXPRESS AND VOYAGER, THE 3.5% CARD FEE FOR MULTI SERVICE, AND THE 3.25% CARD FEE FOR AVCARD INCLUDE THE NETWORK TRANSACTION FEE COST.

~~FLEETSHARE IS BASED ON QUARTERLY PRIME RATE, MINIMUM DISCOUNT RATE IS 1.5%.~~

(1)   Invoiced one time by location on the applicable monthly invoice.
(2)   Invoiced monthly to Buyer and itemized by location.

OCT 19 2001 2:14PM   'P LASERJET 3200                                              P.2

# DEALER STORAGE AGREEMENT

THIS AGREEMENT, made and entered into this 6th day of August, 2001, by and between C.A.S. Handling, Inc. ("FBO"), a corporation organized and existing under and by virtue of the laws of the State of New York with a principal office located at Stewart International Airport, 1037 First Street, Bldg. 140, New Windsor, New York 12553, and PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company ("Phillips"), a Delaware corporation with an office in Bartlesville, Oklahoma;

## WITNESSETH:

WHEREAS, Phillips has supply contracts with various commercial customers, such as airlines and air freight companies, to provide aviation fuel at certain locations, one of which is FBO's location; and

WHEREAS, FBO has, under separate contract, agreed to deliver the fuel Phillips sells to such commercial customers, and in connection therewith is willing to also store such fuel for Phillips and maintain an inventory thereof until it is delivered to carriers requesting Phillips products.

NOW, THEREFORE, for and in consideration of the mutual promises and convenants to be performed by the parties herein, it is agreed as follows:

1. FBO shall store for Phillips aviation fuel belonging to Phillips, and shall deliver such fuel only as directed by Phillips and carrier. FBO represents that it leases and maintains adequate facilities to perform the services called for herein, including storage tanks, pumps, meters, filters, fill and discharge mechanisms, and refueler trucks which are suitable to meet current aviation and petroleum standards for storing, pumping, filtering and dispensing aviation fuels. FBO will manage Phillips' fuel inventory in a manner that provides adequate supply to meet anticipated fuel demand by Phillips' into-plane customers, but that minimizes Phillips' fuel in FBO's storage. Phillips' concurrence shall not be required for fuel ordered by FBO hereunder, unless Phillips notifies FBO that such concurrence will be required. FBO agrees to have storage space available to accommodate Phillips' needs, however, maximum amounts in storage may be limited at FBO's discretion. Phillips may inspect FBO's facilities at any time and from time to time to verify the adequacy of facilities, quality control procedures and practices, and quantity of Phillips' fuel in storage subject to written notice faxed to FBO at least 24 hours prior to inspection.

2. This Agreement shall commence on the date first set forth above and remain in full force and effect for one year and thereafter from year to year; provided that, either party at any time may cancel the contract by giving the other party thirty (30) days written notice of cancellation; provided further that, this agreement shall automatically terminate upon termination of the Branded Aviation Dealer Sales Agreement between the parties hereto. Upon cancellation or termination of this Agreement, the FBO and Phillips will balance the account using the following procedure: Any fuel belonging to Phillips which remains in FBO's storage shall be purchased by FBO at the price in effect on the most recent shipment day on which the Phillips-owned product was originally loaded at the terminal. In the event of a deficit storage balance, Phillips shall credit the FBO's account for such deficit using the price in effect on the most recent shipment day on which the FBO's own general aviation product was originally loaded at the terminal. In either event, each preceding shipment day will be used if more than one load is required to balance the account.

3. There shall be no fee charged Phillips by FBO for storage under this Agreement. All fees or charges to be paid by Phillips to FBO shall accrue under the terms of other agreements between the parties, including the Dealer Service Charge Agreement.

1

Aged - Dealer Storage

1/1/2000

OCT 19 2001 2:14PM    'P LASERJET 3200                                          p.2

# DEALER STORAGE AGREEMENT

THIS AGREEMENT, made and entered into this 6th day of August, 2001, by and between C.A.S. Handling, Inc. ("FBO"), a corporation organized and existing under and by virtue of the laws of the State of New York with a principal office located at Stewart International Airport, 1037 First Street, Bldg. 140, New Windsor, New York 12553, and PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company ("Phillips"), a Delaware corporation with an office in Bartlesville, Oklahoma;

## WITNESSETH:

WHEREAS, Phillips has supply contracts with various commercial customers, such as airlines and air freight companies, to provide aviation fuel at certain locations, one of which is FBO's location; and

WHEREAS, FBO has, under separate contract, agreed to deliver the fuel Phillips sells to such commercial customers, and in connection therewith is willing to also store such fuel for Phillips and maintain an inventory thereof until it is delivered to carriers requesting Phillips products.

NOW, THEREFORE, for and in consideration of the mutual promises and convenants to be performed by the parties herein, it is agreed as follows:

1. FBO shall store for Phillips aviation fuel belonging to Phillips, and shall deliver such fuel only as directed by Phillips and carrier. FBO represents that it leases and maintains adequate facilities to perform the services called for herein, including storage tanks, pumps, meters, filters, fill and discharge mechanisms, and refueler trucks which are suitable to meet current aviation and petroleum standards for storing, pumping, filtering and dispensing aviation fuels. FBO will manage Phillips' fuel inventory in a manner that provides adequate supply to meet anticipated fuel demand by Phillips' into-plane customers, but that minimizes Phillips' fuel in FBO's storage. Phillips' concurrence shall not be required for fuel ordered by FBO hereunder, unless Phillips notifies FBO that such concurrence will be required. FBO agrees to have storage space available to accommodate Phillips' needs, however, maximum amounts in storage may be limited at FBO's discretion. Phillips may inspect FBO's facilities at any time and from time to time to verify the adequacy of facilities, quality control procedures and practices, and quantity of Phillips' fuel in storage subject to written notice faxed to FBO at least 24 hours prior to inspection.

2. This Agreement shall commence on the date first set forth above and remain in full force and effect for one year and thereafter from year to year; provided that, either party at any time may cancel the contract by giving the other party thirty (30) days written notice of cancellation; provided further that, this agreement shall automatically terminate upon termination of the Branded Aviation Dealer Sales Agreement between the parties hereto. Upon cancellation or termination of this Agreement, the FBO and Phillips will balance the account using the following procedure: Any fuel belonging to Phillips which remains in FBO's storage shall be purchased by FBO at the price in effect on the most recent shipment day on which the Phillips-owned product was originally loaded at the terminal. In the event of a deficit storage balance, Phillips shall credit the FBO's account for such deficit using the price in effect on the most recent shipment day on which the FBO's own general aviation product was originally loaded at the terminal. In either event, each preceding shipment day will be used if more than one load is required to balance the account.

3. There shall be no fee charged Phillips by FBO for storage under this Agreement. All fees or charges to be paid by Phillips to FBO shall accrue under the terms of other agreements between the parties, including the Dealer Service Charge Agreement.

1

Agmt - Dealer Storage                                                          1/1/2000

4. FBO shall maintain proper accounting records of all fuel received, stored or dispensed in accordance with accounting procedures which may be agreed upon from time to time between the parties. Phillips will maintain a concurrent set of transaction records and will provide a monthly summary of transactions to FBO. FBO and Phillips will reconcile their respective accounting records quarterly.

5. All fuel stored hereunder shall at all times be and remain the property of Phillips. Phillips shall be responsible for payment of all applicable taxes on such fuel.

6. FBO shall be responsible for all fuel losses, whether as a result of disappearance, contamination, or otherwise. FBO's liability to Phillips for lost fuel shall be limited to the replacement value thereof. FBO shall in no event be liable to Phillips for consequential damages of any kind occurring as a result of its performance of this Agreement. Notwithstanding the foregoing, FBO shall be liable to Phillips for losses, damages, fines or penalties Phillips is obligated to pay to any third party arising out of fuel loss, disappearance or contamination.

7. Failure or delay in performance by either party is excused if caused by acts of God; storm, earthquake, epidemic, fire, flood, explosion; accidents; acts of the public enemy, rebellion, insurrection, sabotage, invasion, riot, war; strikes, lockouts or other industrial disturbances; compliance with acts, rules, regulations or orders of federal, state or local government, any agency thereof or other authority having or purporting to have jurisdiction; mechanical failures or similar causes not due to the fault or negligence of a party and beyond such party's control.

8. (a) The interpretation and performance of this agreement shall be governed by and construed in accordance with the laws of Oklahoma except for any rule of Oklahoma law which would make the law of any other jurisdiction applicable.

   (b) If any dispute arises from or relates to this agreement or the termination thereof, prior to resorting to litigation, the parties agree to endeavor in good faith to settle the dispute in an amicable manner by mediation. Such mediation effort by the aggrieved party shall be a condition precedent to the filing of any lawsuit relating to this agreement or the termination thereof.

   (c) In the event that any mediation is unsuccessful in resolving a dispute, the parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Oklahoma for any litigation which arises from or relates to this agreement or the termination thereof. If such court lacks jurisdiction or declines to exercise jurisdiction, the parties irrevocably submit to the jurisdiction and venue of the District Court of Tulsa County, Oklahoma, for the resolution of such disputes.

9. Each party shall maintain a true and correct set of records pertaining to performance of this Agreement and all transactions related thereto. Each party further agrees to retain all such records for a period of not less than two (2) years after completion of performance under this Agreement. Any representative(s) authorized by either party may audit any and all such records of the other party during normal business hours at any time or times during performance of this Agreement and during the two (2) year period after completion of performance. FBO further agrees that all stored fuel and FBO's facilities used in connection therewith shall be available to Phillips for purposes of inspection by Phillips, or its designated representative, at all reasonable times.

4.  FBO shall maintain proper accounting records of all fuel received, stored or dispensed in accordance with accounting procedures which may be agreed upon from time to time between the parties.  Phillips will maintain a concurrent set of transaction records and will provide a monthly summary of transactions to FBO.  FBO and Phillips will reconcile their respective accounting records quarterly.

5.  All fuel stored hereunder shall at all times be and remain the property of Phillips.  Phillips shall be responsible for payment of all applicable taxes on such fuel.

6.  FBO shall be responsible for all fuel losses, whether as a result of disappearance, contamination, or otherwise.  FBO's liability to Phillips for lost fuel shall be limited to the replacement value thereof.  FBO shall in no event be liable to Phillips for consequential damages of any kind occurring as a result of its performance of this Agreement.  Notwithstanding the foregoing, FBO shall be liable to Phillips for losses, damages, fines or penalties Phillips is obligated to pay to any third party arising out of fuel loss, disappearance or contamination.

7.  Failure or delay in performance by either party is excused if caused by acts of God; storm, earthquake, epidemic, fire, flood, explosion; accidents; acts of the public enemy, rebellion, insurrection, sabotage, invasion, riot, war; strikes, lockouts or other industrial disturbances; compliance with acts, rules, regulations or orders of federal, state or local government, any agency thereof or other authority having or purporting to have jurisdiction; mechanical failures or similar causes not due to the fault or negligence of a party and beyond such party's control.

8.        (a)  The interpretation and performance of this agreement shall be governed by and construed in accordance with the laws of Oklahoma except for any rule of Oklahoma law which would make the law of any other jurisdiction applicable.

          (b)  If any dispute arises from or relates to this agreement or the termination thereof, prior to resorting to litigation, the parties agree to endeavor in good faith to settle the dispute in an amicable manner by mediation.  Such mediation effort by the aggrieved party shall be a condition precedent to the filing of any lawsuit relating to this agreement or the termination thereof.

          (c)  In the event that any mediation is unsuccessful in resolving a dispute, the parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Oklahoma for any litigation which arises from or relates to this agreement or the termination thereof.  If such court lacks jurisdiction or declines to exercise jurisdiction, the parties irrevocably submit to the jurisdiction and venue of the District Court of Tulsa County, Oklahoma, for the resolution of such disputes.

9.  Each party shall maintain a true and correct set of records pertaining to performance of this Agreement and all transactions related thereto.  Each party further agrees to retain all such records for a period of not less than two (2) years after completion of performance under this Agreement.  Any representative(s) authorized by either party may audit any and all such records of the other party during normal business hours at any time or times during performance of this Agreement and during the two (2) year period after completion of performance.  FBO further agrees that all stored fuel and FBO's facilities used in connection therewith shall be available to Phillips for purposes of inspection by Phillips, or its designated representative, at all reasonable times.

2

10. All notices shall be directed to the parties as indicated hereinbelow by certified or registered mail, return receipt requested, or electronically, or to such other address as a party may designate to the other in writing.

FBO: CAS Handling, Inc.                    Phillips: PHILLIPS PETROLEUM COMPANY
Stewart International Airport                        Attn:  Manager, Aviation Marketing
1037 First Street                                        611 Adams Building
Bldg. 140                                                Bartlesville, OK  74004
New Windsor, NY 12553

Notices sent by mail shall be effective when deposited in the U.S. mail, postage prepaid and properly addressed. Any other notice shall be effective when received.

11. This Agreement shall not be assignable by either party except with the written consent of the other. This Agreement and the provisions hereof shall be subject to all applicable state and federal laws and to all rules, regulations, orders and directives of any governmental authority, agency, commission or regulatory body in connection with any and all matters or things under or incident to this Agreement. This Agreement embodies the entire agreement between the parties regarding the subject matter hereof, and there are no promises, assurances, terms, conditions or obligations, whether by precedent or otherwise, other than those contained herein. No variation, modification or reformation hereof shall be deemed valid unless signed by the parties hereto with the same formality as this Agreement.    This contract shall not be binding on Seller unless and until signed by Seller's authorized representative. Commencement of performance hereunder prior to signing by Seller, as herein stipulated, shall in no case be construed as a waiver by Seller of this requirement.

EXECUTED the day and year first above written.

C.A.S. Handling, Inc. (FBO)                     PHILLIPS 66 COMPANY, a division of
                                                 PHILLIPS PETROLEUM COMPANY

By _____                      By _____
        Rodney Boccadoro, Jr.                           Keith D. Reneau

Title  Vice President _____                     Title     Commercial Aviation Manager

3

10. All notices shall be directed to the parties as indicated hereinbelow by certified or registered mail, return receipt requested, or electronically, or to such other address as a party may designate to the other in writing.

| | |
|---|---|
| FBO: CAS Handling, Inc. | Phillips: PHILLIPS PETROLEUM COMPANY |
| Stewart International Airport | Attn: Manager, Aviation Marketing |
| 1037 First Street | 611 Adams Building |
| Bldg. 140 | Bartlesville, OK 74004 |
| New Windsor, NY 12553 | |

Notices sent by mail shall be effective when deposited in the U.S. mail, postage prepaid and properly addressed. Any other notice shall be effective when received.

11. This Agreement shall not be assignable by either party except with the written consent of the other. This Agreement and the provisions hereof shall be subject to all applicable state and federal laws and to all rules, regulations, orders and directives of any governmental authority, agency, commission or regulatory body in connection with any and all matters or things under or incident to this Agreement. This Agreement embodies the entire agreement between the parties regarding the subject matter hereof, and there are no promises, assurances, terms, conditions or obligations, whether by precedent or otherwise, other than those contained herein. No variation, modification or reformation hereof shall be deemed valid unless signed by the parties hereto with the same formality as this Agreement.    This contract shall not be binding on Seller unless and until signed by Seller's authorized representative. Commencement of performance hereunder prior to signing by Seller, as herein stipulated, shall in no case be construed as a waiver by Seller of this requirement.

EXECUTED the day and year first above written.

| | |
|---|---|
| C.A.S. Handling, Inc. (FBO) | PHILLIPS 66 COMPANY, a division of |
| | PHILLIPS PETROLEUM COMPANY |
| By _____ | By _____ |
| Rodney Boccadoro, Jr. | Keith D. Reneau |
| Title  Vice President _____ | Title   Commercial Aviation Manager _____ |

3

## PHILLIPS-INTO-PLANE
## DEALER SERVICE CHARGE AGREEMENT

It is agreed between PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company, hereinafter

called "Phillips", and ___C. A. S. Handling Inc.___

(Dealer Legal Name)

of _____New York_____ hereinafter called "Dealer", as follows:

(City, State)

1.  Dealer agrees to deliver aviation fuel supplied by Phillips into aircraft operated by various classes of airlines and air travel clubs, hereinafter referred to as "customers", as authorized in writing by Phillips, and render related services for same as hereinafter set forth.

2.  All data related to said fuelings and services shall be assigned and electronically transmitted to Phillips by Dealer via point of sale (POS) machine on the day the fueling and servicing occurs, and Phillips will invoice the customer. Upon receipt and validation of the delivery data, credit will be issued by Phillips to Dealer in accordance with the following:

    a.  Dealer's service charge and airport fee as set forth in paragraphs 4 and 5 below plus, except when a Storage Agreement is in effect at the dealer's location, credit for aviation fuel delivered into customer aircraft. Fuel credit will be based on Dealer's cost on the day of fueling, including applicable taxes paid by Dealer.

    b.  Provided the delivery ticket also covers an aircraft fueling, credit will be issued to Dealer for amounts shown on assigned delivery tickets for the following:

        (1)  Aviation oils delivered into aircraft.

        (2)  Lubrication, tire repairs, battery service, ADI fluid and alcohol.

        (3)  Transient aircraft storage and tie down, limited to ~~three~~ *five* days per aircraft.

        (4)  Amount shown on delivery ticket for services performed on aircraft, both mechanical (labor and parts) and personal, including charges for loading ramp, heater, baggage handling, catering, water, APU, lavatory service, etc. The total of such charges for any one aircraft shall not exceed ~~$500.00~~ per fueling without specific authority from Phillips. *$750.00*

3.  All electronically transmitted delivery tickets shall be assigned without recourse except that Dealer warrants the validity of all charges and Phillips shall have full recourse to and against Dealer in the event the customer refuses to pay Phillips' invoice for reasons related to invalidity or inaccuracy of any charge or alleged unsatisfactory service, material and/or workmanship. Delivery tickets that are not assigned and transmitted to Phillips on the same day of customer fueling and servicing, or covering fuel not supplied by Phillips, may be charged back to Dealer at Phillips' option. Dealer's failure to assign and transmit fueling information in a complete and timely manner as provided herein shall be grounds for termination of this Agreement upon receipt of written notice from Phillips to Dealer.

4.  The current airport flowage fee applicable to said fuelings is ___.066___ per gallon.

5.  Dealer's service charge for deliveries of aviation fuels under this Agreement will be:

| Avgas | | Jet A | |
|-------|------|-------|------|
| Gallons | Rate | Gallons | Rate |
| NA | | 0 - 500 | .38 |
| | | 501 - 1000 | .32 |
| | | 1001 - 3000 | .22 |
| | | 3001 - 6000 | .18 |
| | | 6001 - 9000 | .16 |
| | | 9001 - 15000 | .14 |
| | | 15001 → UP | .12 |

6.  Dealer's service charge and/or airport flowage fee may be changed by Dealer giving seven (7) days' advance written notice to Phillips in order that customers may receive advance notice of the change.

1

AGMT-DEALER SERVICE CHARGE

1/1/2000

NOV-30-2004  15:20

# PHILLIPS-INTO-PLANE
## DEALER SERVICE CHARGE AGREEMENT

It is agreed between PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company, hereinafter

called "Phillips", and ___C. A. S. Handling Inc._____

of _____New York_____ hereinafter called "Dealer", as follows:

(City, State)                                    (Dealer Legal Name)

1.  Dealer agrees to deliver aviation fuel supplied by Phillips into aircraft operated by various classes of airlines and air travel clubs, hereinafter referred to as "customers", as authorized in writing by Phillips, and render related services for same as hereinafter set forth.

2.  All data related to said fuelings and services shall be assigned and electronically transmitted to Phillips by Dealer via point of sale (POS) machine on the day the fueling and servicing occurs, and Phillips will invoice the customer. Upon receipt and validation of the delivery data, credit will be issued by Phillips to Dealer in accordance with the following:

    a.  Dealer's service charge and airport fee as set forth in paragraphs 4 and 5 below plus, except when a Storage Agreement is in effect at the dealer's location, credit for aviation fuel delivered into customer aircraft. Fuel credit will be based on Dealer's cost on the day of fueling, including applicable taxes paid by Dealer.

    b.  Provided the delivery ticket also covers an aircraft fueling, credit will be issued to Dealer for amounts shown on assigned delivery tickets for the following:

        (1)  Aviation oils delivered into aircraft.

        (2)  Lubrication, tire repairs, battery service, ADI fluid and alcohol.

        (3)  Transient aircraft storage and tie down, limited to ~~three~~ *five* days per aircraft.

        (4)  Amount shown on delivery ticket for services performed on aircraft, both mechanical (labor and parts) and personal, including charges for loading ramp, heater, baggage handling, catering, water, APU, lavatory service, etc. The total of such charges for any one aircraft shall not exceed ~~$500.00~~ per fueling *$750.00* without specific authority from Phillips.

3.  All electronically transmitted delivery tickets shall be assigned without recourse except that Dealer warrants the validity of all charges and Phillips shall have full recourse to and against Dealer in the event the customer refuses to pay Phillips' invoice for reasons related to invalidity or inaccuracy of any charge or alleged unsatisfactory service, material and/or workmanship. Delivery tickets that are not assigned and transmitted to Phillips on the same day of customer fueling and servicing, or covering fuel not supplied by Phillips, may be charged back to Dealer at Phillips' option. Dealer's failure to assign and transmit fueling information in a complete and timely manner as provided herein shall be grounds for termination of this Agreement upon receipt of written notice from Phillips to Dealer.

4.  The current airport flowage fee applicable to said fuelings is _.066_ per gallon.

5.  Dealer's service charge for deliveries of aviation fuels under this Agreement will be:

| Avgas | | Jet A | |
|-------|------|---------|------|
| Gallons | Rate | Gallons | Rate |
| *NA* | | 0-500 | .38 |
| | | 501-1000 | .32 |
| | | 1001-3000 | .22 |
| | | 3001-6000 | .18 |
| | | 6001-9000 | .16 |
| | | 9001-15000 | .14 |
| | | 15001 → up | .12 |

6.  Dealer's service charge and/or airport flowage fee may be changed by Dealer giving seven (7) days' advance written notice to Phillips in order that customers may receive advance notice of the change.

1

1/1/2000

AGMT.DEALER SERVICE CHARGE

7. Phillips will inform Dealer of the procedures to be employed in the performance of this Agreement. If required by Phillips, Dealer agrees to execute a quarterly statement, certified as accurate by Phillips, so that Phillips can file for the Federal Excise Tax refund on all sales to tax exempt airlines.

8. This Agreement shall commence on the date set forth below and remain in full force and effect for one year and thereafter from year to year; provided that, either party at any time may cancel the contract by giving the other party thirty (30) days' advance written notice of cancellation. Notwithstanding the forgoing, this agreement shall automatically terminate upon termination of the Branded Aviation Dealer Sales Contract.

9. a. The interpretation and performance of this agreement shall be governed by and construed in accordance with the laws of Oklahoma except for any rule of Oklahoma law which would make the law of any other jurisdiction applicable.

   b. If any dispute arises from or relates to this agreement or the termination thereof, prior to resorting to litigation, the parties agree to endeavor in good faith to settle the dispute in an amicable manner by mediation. Such mediation effort by the aggrieved party shall be a condition precedent to the filing of any lawsuit relating to this agreement or the termination thereof.

   c. In the event that any mediation is unsuccessful in resolving a dispute, the parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Oklahoma for any litigation which arises from or relates to this agreement or the termination thereof. If such court lacks jurisdiction or declines to exercise jurisdiction, the parties irrevocably submit to the jurisdiction and venue of the District Court of Tulsa County, Oklahoma, for the resolution of such disputes.

10. Both parties hereto shall maintain a true and correct set of records pertaining to all activities relating to their performance of this Agreement and all transactions related thereto. The parties further agree to retain all such records for a period of not less than two (2) years after completion of performance hereunder. Any representative(s) authorized by a party may audit any and all such records of the other party at any time(s) during the term of this Agreement and during the two (2) year period after completion of performance of this Agreement.

11. Dealer shall in all things be an independent contractor in its performance hereunder and Dealer shall indemnify, defend and hold Phillips harmless from and against all claims of every character, including claims of personal injury, property damage or death, arising out of or related to Dealer's performance hereunder.

12. This Agreement supersedes and takes the place of any former Dealer Service Charge Agreement, and amendments thereof, heretofore entered into between the parties.

13. When duly executed, this agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns; provided, however, that Dealer shall not assign this agreement in whole or in part without the prior written consent of Phillips; and provided further that Phillips' consent shall not be unreasonably withheld if reasonable requirements imposed by Phillips are first met.

14. This contract shall not be binding on Seller unless and until signed by Seller's authorized representative. Commencement of performance hereunder prior to signing by Seller, as herein stipulated, shall in no case be construed as a waiver by Seller of this requirement.

EXECUTED this 31st day of October 2001

C.A.S. Handling, Inc.                          PHILLIPS 66 COMPANY, a division of
_____                      Phillips Petroleum Company
(Dealer)

By _____                     By _____
(Company Officer or Authorized Agent)

Title VICE-PRESIDENT                            Title   Commercial Aviation Manager

2

1/1/2000

TOTAL P.02

P.18/24

NOV-30-2004  15:20

7. Phillips will inform Dealer of the procedures to be employed in the performance of this Agreement. If required by Phillips, Dealer agrees to execute a quarterly statement, certified as accurate by Phillips, so that Phillips can file for the Federal Excise Tax refund on all sales to tax exempt airlines.

8. This Agreement shall commence on the date set forth below and remain in full force and effect for one year and thereafter from year to year; provided that, either party at any time may cancel the contract by giving the other party thirty (30) days' advance written notice of cancellation. Notwithstanding the foregoing, this agreement shall automatically terminate upon termination of the Branded Aviation Dealer Sales Contract.

9. a. The interpretation and performance of this agreement shall be governed by and construed in accordance with the laws of Oklahoma except for any rule of Oklahoma law which would make the law of any other jurisdiction applicable.

   b. If any dispute arises from or relates to this agreement or the termination thereof, prior to resorting to litigation, the parties agree to endeavor in good faith to settle the dispute in an amicable manner by mediation. Such mediation effort by the aggrieved party shall be a condition precedent to the filing of any lawsuit relating to this agreement or the termination thereof.

   c. In the event that any mediation is unsuccessful in resolving a dispute, the parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Oklahoma for any litigation which arises from or relates to this agreement or the termination thereof. If such court lacks jurisdiction or declines to exercise jurisdiction, the parties irrevocably submit to the jurisdiction and venue of the District Court of Tulsa County, Oklahoma, for the resolution of such disputes.

10. Both parties hereto shall maintain a true and correct set of records pertaining to all activities relating to their performance of this Agreement and all transactions related thereto. The parties further agree to retain all such records for a period of not less than two (2) years after completion of performance hereunder. Any representative(s) authorized by a party may audit any and all such records of the other party at any time(s) during the term of this Agreement and during the two (2) year period after completion of performance of this Agreement.

11. Dealer shall in all things be an independent contractor in its performance hereunder and Dealer shall indemnify, defend and hold Phillips harmless from and against all claims of every character, including claims of personal injury, property damage or death, arising out of or related to Dealer's performance hereunder.

12. This Agreement supersedes and takes the place of any former Dealer Service Charge Agreement, and amendments thereof, heretofore entered into between the parties.

13. When duly executed, this agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns; provided, however, that Dealer shall not assign this agreement in whole or in part without the prior written consent of Phillips; and provided further that Phillips' consent shall not be unreasonably withheld if reasonable requirements imposed by Phillips are first met.

14. This contract shall not be binding on Seller unless and until signed by Seller's authorized representative. Commencement of performance hereunder prior to signing by Seller, as herein stipulated, shall in no case be construed as a waiver by Seller of this requirement.

EXECUTED this  31st  day of  October  2001

C.A.S. Handling, Inc.

(Dealer)

By

(Company Officer or Authorized Agent)

Title  VICE-PRESIDENT

PHILLIPS 66 COMPANY, a division of
Phillips Petroleum Company

By

Title  Commercial Aviation Manager

2

1/1/2000

ACMT-DEALER SERVICE CHARGE

TOTAL P.02

# PHILLIPS-INTO-PLANE
## DEALER SERVICE CHARGE AGREEMENT

It is agreed between PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company, hereinafter

called "Phillips", and ___C. A. S. Handling Inc.___
[Dealer Legal Name]

of _____New York_____ hereinafter called "Dealer", as follows:
[City, State]

1.   Dealer agrees to deliver aviation fuel supplied by Phillips into aircraft operated by various classes of airlines and air travel clubs, hereinafter referred to as "customers", as authorized in writing by Phillips, and render related services for same as hereinafter set forth.

2.   All data related to said fuelings and services shall be assigned and electronically transmitted to Phillips by Dealer via point of sale (POS) machine on the day the fueling and servicing occurs, and Phillips will invoice the customer. Upon receipt and validation of the delivery data, credit will be issued by Phillips to Dealer in accordance with the following:

   a.   Dealer's service charge and airport fee as set forth in paragraphs 4 and 5 below plus, except when a Storage Agreement is in effect at the dealer's location, credit for aviation fuel delivered into customer aircraft. Fuel credit will be based on Dealer's cost on the day of fueling, including applicable taxes paid by Dealer.

   b.   Provided the delivery ticket also covers an aircraft fueling, credit will be issued to Dealer for amounts shown on assigned delivery tickets for the following:

      (1)   Aviation oils delivered into aircraft.
      (2)   Lubrication, tire repairs, battery service, ADI fluid and alcohol.
      (3)   Transient aircraft storage and tie down, limited to ~~three~~ *five* days per aircraft.
      (4)   Amount shown on delivery ticket for services performed on aircraft, both mechanical (labor and parts) and personal, including charges for loading ramp, heater, baggage handling, catering, water, APU, lavatory service, etc. The total of such charges for any one aircraft shall not exceed ~~$500.00~~ per fueling without specific authority from Phillips. *$750.00*

3.   All electronically transmitted delivery tickets shall be assigned without recourse except that Dealer warrants the validity of all charges and Phillips shall have full recourse to and against Dealer in the event the customer refuses to pay Phillips' invoice for reasons related to invalidity or inaccuracy of any charge or alleged unsatisfactory service, material and/or workmanship. Delivery tickets that are not assigned and transmitted to Phillips on the same day of customer fueling and servicing, or covering fuel not supplied by Phillips, may be charged back to Dealer at Phillips' option. Dealer's failure to assign and transmit fueling information in a complete and timely manner as provided herein shall be grounds for termination of this Agreement upon receipt of written notice from Phillips to Dealer.

4.   The current airport flowage fee applicable to said fuelings is _.066_ per gallon.

5.   Dealer's service charge for deliveries of aviation fuels under this Agreement will be:

| Avgas | | Jet A | |
|---|---|---|---|
| Gallons | Rate | Gallons | Rate |
| | | 0-500 | .38 |
| NA | | 501-1000 | .32 |
| | | 1001-3000 | .22 |
| | | 3001-6000 | .18 |
| | | 6001-9000 | .16 |
| | | 9001-15000 | .14 |
| | | 15001 → up | .12 |

6.   Dealer's service charge and/or airport flowage fee may be changed by Dealer giving seven (7) days' advance written notice to Phillips in order that customers may receive advance notice of the change.

1

AGMT-DEALER SERVICE CHARGE                                                              1/1/2000

## PHILLIPS-INTO-PLANE
## DEALER SERVICE CHARGE AGREEMENT

It is agreed between PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company, hereinafter

called "Phillips", and ___C.A.S. Handling Inc.___

                                       (Dealer Legal Name)

of ___New York___ hereinafter called "Dealer", as follows:
              (City, State)

1. Dealer agrees to deliver aviation fuel supplied by Phillips into aircraft operated by various classes of airlines and air travel clubs, hereinafter referred to as "customers", as authorized in writing by Phillips, and render related services for same as hereinafter set forth.

2. All data related to said fuelings and services shall be assigned and electronically transmitted to Phillips by Dealer via point of sale (POS) machine on the day the fueling and servicing occurs, and Phillips will invoice the customer. Upon receipt and validation of the delivery data, credit will be issued by Phillips to Dealer in accordance with the following:

   a. Dealer's service charge and airport fee as set forth in paragraphs 4 and 5 below plus, except when a Storage Agreement is in effect at the dealer's location, credit for aviation fuel delivered into customer aircraft. Fuel credit will be based on Dealer's cost on the day of fueling, including applicable taxes paid by Dealer.

   b. Provided the delivery ticket also covers an aircraft fueling, credit will be issued to Dealer for amounts shown on assigned delivery tickets for the following:

      (1) Aviation oils delivered into aircraft.

      (2) Lubrication, tire repairs, battery service, ADI fluid and alcohol.

      (3) Transient aircraft storage and tie down, limited to ~~three~~ *five* days per aircraft.

      (4) Amount shown on delivery ticket for services performed on aircraft, both mechanical (labor and parts) and personal, including charges for loading ramp, heater, baggage handling, catering, water, APU, lavatory service, etc. The total of such charges for any one aircraft shall not exceed ~~$500.00~~ *$750.00* per fueling without specific authority from Phillips.

3. All electronically transmitted delivery tickets shall be assigned without recourse except that Dealer warrants the validity of all charges and Phillips shall have full recourse to and against Dealer in the event the customer refuses to pay Phillips' invoice for reasons related to invalidity or inaccuracy of any charge or alleged unsatisfactory service, material and/or workmanship. Delivery tickets that are not assigned and transmitted to Phillips on the same day of customer fueling and servicing, or covering fuel not supplied by Phillips, may be charged back to Dealer at Phillips' option. Dealer's failure to assign and transmit fueling information in a complete and timely manner as provided herein shall be grounds for termination of this Agreement upon receipt of written notice from Phillips to Dealer.

4. The current airport flowage fee applicable to said fuelings is ___+066___ per gallon.

5. Dealer's service charge for deliveries of aviation fuels under this Agreement will be:

| Avgas | | | Jet A | |
|---|---|---|---|---|
| Gallons | Rate | | Gallons | Rate |
| | | | 0-500 | .38 |
| | | | 501-1000 | .32 |
| NA | | | 1001-3000 | .22 |
| | | | 3001-6000 | .18 |
| | | | 6001-9000 | .16 |
| | | | 9001-15000 | .14 |
| | | | 15001 → UP | .12 |

6. Dealer's service charge and/or airport flowage fee may be changed by Dealer giving seven (7) days' advance written notice to Phillips in order that customers may receive advance notice of the change.

1

AGMT-DEALER SERVICE CHARGE

1/1/2000

11-79-01



## ADDITIVE AMENDMENT

THIS AMENDMENT is made and entered into by and between **PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company**, a Delaware corporation ("Phillips"), and __C.A.S. HANDLING, INC.; Stewart Intl Airport; 1037 First Street, Bldg 140; New Windsor, NY 12553_____ (Buyer);

### W I T N E S S E T H:

WHEREAS, Phillips and Buyer are parties to a Branded Aviation Dealer Sales Contract ("Contract"), under which Buyer purchases certain aviation fuels from Phillips for resale;

WHEREAS, Buyer wishes to resell jet fuel both with and without Phillips' proprietary additive in order to accommodate the needs of airlines and general aviation customers; and

WHEREAS, Phillips is therefore willing to forego its normal practice of placing additive in all jet fuel sold and delivered to Buyer in return for Buyer's commitment to inject Phillips' additive into all jet fuel sold under the Contract; to aircraft customers requiring additive

NOW, THEREFORE, for and in consideration of the mutual covenants and promises contained herein, the parties agree as follows:

1.    Phillips shall:

    (a)    At its own cost and expense provide and install injection equipment;

    (b)    At its own cost and expense supply additive whenever requested by Buyer and/or whenever Phillips deems it necessary;

    (c)    Arrange for repairs and/or replacements of injection parts and equipment; and

    (d)    Have the right to spot check additive content of jet fuel being delivered under the Contract by obtaining samples from appropriate locations chosen by Phillips.

    (e)    Supply and maintain complete test equipment/ supplies for quality control monitoring of injection system.

-1-

O;CM/data/additiveCAS

11-19-01

### ADDITIVE AMENDMENT

THIS AMENDMENT is made and entered into by and between **PHILLIPS 66 COMPANY, a division of Phillips Petroleum Company, a Delaware corporation ("Phillips"), and  C.A.S. HANDLING, INC.; Stewart Intl Airport; 1037 First Street, Bldg 140; New Windsor, NY 12553** (Buyer);

### W I T N E S S E T H :

WHEREAS, Phillips and Buyer are parties to a Branded Aviation Dealer Sales Contract ("Contract"), under which Buyer purchases certain aviation fuels from Phillips for resale;

WHEREAS, Buyer wishes to resell jet fuel both with and without Phillips' proprietary additive in order to accommodate the needs of airlines and general aviation customers; and

WHEREAS, Phillips is therefore willing to forego its normal practice of placing additive in all jet fuel sold and delivered to Buyer in return for Buyer's commitment to inject Phillips' additive into all jet fuel sold under the Contract, to aircraft customers requiring additive

NOW, THEREFORE, for and in consideration of the mutual covenants and promises contained herein, the parties agree as follows:

1.  Phillips shall:

    (a)  At its own cost and expense provide and install injection equipment;

    (b)  At its own cost and expense supply additive whenever requested by Buyer and/or whenever Phillips deems it necessary;

    (c)  Arrange for repairs and/or replacements of injection parts and equipment; and

    (d)  Have the right to spot check additive content of jet fuel being delivered under the Contract by obtaining samples from appropriate locations chosen by Phillips.

    (e)  Supply and maintain complete test equipment supplies for quality control monitoring of injection system.

-1-

## GUARANTY

IN CONSIDERATION of PHILLIPS PETROLEUM COMPANY and/or one or more of its subsidiaries (hereinafter referred to collectively as "Creditor") entering into certain agreements and/or leases with, and extending credit to, _____ C.A.S. Handling, Inc. _____, State of _____ NY _____ (hereinafter referred to as "Principal Debtor") and in order to induce Creditor to do so, the undersigned jointly and severally hereby guarantees the prompt payment at maturity of all indebtedness hereafter or heretofore so incurred by the said Principal Debtor to Creditor under the terms of any and all such agreements, leases and extensions of credit.

This guaranty is accepted by Creditor and such agreements and leases are entered into and such credit extended subject to the following conditions:

Any such indebtedness becoming due and payable to Creditor in reliance on the guaranty of the undersigned, may at any time be settled and adjusted between Creditor and the Principal Debtor by note or notes of said Principal Debtor, either endorsed or unendorsed, and with or without further security, and the time of payment of any such indebtedness or notes or other security given therefor may be extended from time to time by Creditor to the Principal Debtor without notice to the undersigned, and such extensions, and any of same, may be for any period (whether or not longer than the original period for payment), all of which may be done without, in any way, affecting the obligations hereby created. The undersigned hereby expressly waives notice of the acceptance of this guaranty by Creditor, waives the notice of all obligations and indebtedness created and credit extended hereunder, waives notice of the taking of notes or other security for such indebtedness as may be incurred by the Principal Debtor to Creditor and waives notice of default by the Principal Debtor.

This instrument is intended to be and shall be construed to be a continuing guaranty without further notice to the undersigned and shall not be revoked by the death of any of the undersigned but shall remain in full force and effect until the undersigned or a legal representative of the undersigned or his estate shall have given notice in writing to enter into no further agreements, leases or other obligations, nor extend further credit on the security of this guaranty, and until such written notice shall be received by Creditor. Such notice shall be sent to:

> Phillips Petroleum Company
> Attention: Credit Department
> 420 South Keeler Avenue
> Bartlesville, OK 74004

Each of the undersigned agrees to make such arrangements as may be necessary to assure that Creditor will be notified as soon as is practically possible in the event of the undersigned's death.

A return receipt for a certified letter shall be conclusive evidence of receipt of notice of revocation. Such revocation when made shall apply only to agreements, leases, credits or other indebtedness or obligations created subsequent to date of receipt of such notice of revocation, and shall not apply to indebtedness thereafter becoming due and payable under leases, agreements, sales or other obligations entered into prior to such revocation. Any payments made after receipt of notice of such revocation shall be applied as Creditor may elect. In the event of default by the Principal Debtor in the payment of his debt or any part thereof, recovery therefor may be had directly against the undersigned without previous notice or without requiring the prosecution of the claim against the Principal Debtor and upon such proof as is competent and admissible against the Principal Debtor. The rights of Creditor are cumulative and shall not be exhausted by the exercise of any of Creditor's rights, hereunder or otherwise, against the undersigned or by any successive actions until and unless all indebtedness hereby guaranteed has been paid.

Creditor may, without notice to the undersigned, sell, assign, or transfer all the indebtedness or obligations covered hereunder, or any part thereof. In that event, each and every immediate and successive assignee, transferee, or holder of all or any part of the indebtedness or obligations shall have the right to enforce this guaranty by legal action or otherwise, for the benefit of such assignee, transferee, or holder, as fully as if such assignee, transferee, or holder were herein by name specifically given such right and power. Creditor shall have an unimpaired right to enforce this guaranty for its benefit as to so much of the indebtedness or obligation as it has not sold, assigned, or transferred.

(1)

(over)

## GUARANTY

IN CONSIDERATION of PHILLIPS PETROLEUM COMPANY and/or one or more of its subsidiaries (hereinafter referred to collectively as "Creditor") entering into certain agreements and/or leases with, and extending credit to, _____C.A.S. Handling, Inc._____, State of ____NY____ (hereinafter referred to as "Principal Debtor") and in order to induce Creditor to do so, the undersigned jointly and severally hereby guarantees the prompt payment at maturity of all indebtedness hereafter or heretofore so incurred by the said Principal Debtor to Creditor under the terms of any and all such agreements, leases and extensions of credit.

This guaranty is accepted by Creditor and such agreements and leases are entered into and such credit extended subject to the following conditions:

Any such indebtedness becoming due and payable to Creditor in reliance on the guaranty of the undersigned, may at any time be settled and adjusted between Creditor and the Principal Debtor by note or notes of said Principal Debtor, either endorsed or unendorsed, and with or without further security, and the time of payment of any such indebtedness or notes or other security given therefor may be extended from time to time by Creditor to the Principal Debtor without notice to the undersigned, and such extensions, and any of same, may be for any period (whether or not longer than the original period for payment), all of which may be done without, in any way, affecting the obligations hereby created. The undersigned hereby expressly waives notice of the acceptance of this guaranty by Creditor, waives the notice of all obligations and indebtedness created and credit extended hereunder, waives notice of the taking of notes or other security for such indebtedness as may be incurred by the Principal Debtor to Creditor and waives notice of default by the Principal Debtor.

This instrument is intended to be and shall be construed to be a continuing guaranty without further notice to the undersigned and shall not be revoked by the death of any of the undersigned but shall remain in full force and effect until the undersigned or a legal representative of the undersigned shall have given notice in writing to enter into no further agreements, leases or other obligations, nor extend further credit on the security of this guaranty, and until such written notice shall be received by Creditor. Such notice shall be sent to:

> Phillips Petroleum Company
> Attention: Credit Department
> 420 South Keeler Avenue
> Bartlesville, OK 74004

Each of the undersigned agrees to make such arrangements as may be necessary to assure that Creditor will be notified as soon as is practically possible in the event of the undersigned's death.

A return receipt for a certified letter shall be conclusive evidence of receipt of notice of revocation. Such revocation when made shall apply only to agreements, leases, credits or other indebtedness or obligations created subsequent to date of receipt of such notice of revocation, and shall not apply to indebtedness thereafter becoming due and payable under leases, agreements, sales or other obligations entered into prior to such revocation. Any payments made after receipt of notice of such revocation shall be applied as Creditor may elect. In the event of default by the Principal Debtor in the payment of his debt or any part thereof, recovery therefor may be had directly against the undersigned without previous notice or without requiring the prosecution of the claim against the Principal Debtor and upon such proof as is competent and admissible against the Principal Debtor. The rights of Creditor are cumulative and shall not be exhausted by the exercise of any of Creditor's rights, hereunder or otherwise, against the undersigned or by any successive actions until and unless all indebtedness hereby guaranteed has been paid.

Creditor may, without notice to the undersigned, sell, assign, or transfer all the indebtedness or obligations covered hereunder, or any part thereof. In that event, each and every immediate and successive assignee, transferee, or holder of all or any part of the indebtedness or obligations shall have the right to enforce this guaranty, by legal action or otherwise, for the benefit of such assignee, transferee, or holder, as fully as if such assignee, transferee, or holder were herein by name specifically given such right and power. Creditor shall have an unimpaired right to enforce this guaranty for its benefit as to so much of the indebtedness or obligation as it has not sold, assigned, or transferred.

**(1)**

(over)

This agreement shall be binding on the undersigned and the undersigned's legal representatives.

IN WITNESS WHEREOF, the undersigned has executed this guaranty this 25TH day of _____July_____, 20 01.

_____
Margaret Ann Ruggiero   (an individual)

_____
Rodney C. Boccadoro, Jr. (an individual)

Notary

Personally came before me this 25^t day of July , 2001. MARGARET Ann Ruggio + Rodney C. Boccadoro Jr.
to me known to be the person(s) who executed the foregoing instrument.

_____
Notary Public

Westchester _____ County
STATE of N.Y.
My Commission Expires _____ 4/30/02

FRANK A. SALANDRA
Notary Public, State of New York
No. 4803345
Qualified in Westchester County
Commission Expires April 30, 2002

(2)

This agreement shall be binding on the undersigned and the undersigned's legal representatives.

IN WITNESS WHEREOF, the undersigned has executed this guaranty this _25th_ day of _July_, 20 _01_.

_____
Margaret Ann Ruggiero   (an individual)

_____
Rodney C. Boccadoro, Jr. (an individual)

Notary

Personally came before me this _25th_ day
of _JULY_, 2001, _MARGARET ANN RUGGIO + Rodney C. Boccadoro Jr._
to me known to be the person(s) who executed
the foregoing instrument.

_____
Notary Public

_West Chester_   County
_STATE_ of _N.Y._   _4/30/0?_
My Commission Expires

FRANK A. SALANDRA
Notary Public, State of New York
No. 4873345
Qualified in Westchester County
Commission Expires April 30, 19??

(2)